August 4, 2026

**VIA ECF**

The Honorable Arun Subramanian
United States District Judge
United States District Court, Southern District of New York
500 Pearl Street, Courtroom 15A
New York, NY 10007

Re:     *United States et al. v. Live Nation Entertainment, Inc., et al.*; **1:24-cv-03973-AS**

Dear Judge Subramanian,

Pursuant to the Court's invitation at the July 31, 2026 hearing on Defendants' post-trial motions, Defendants submit this letter to address certain issues that arose at the hearing and to respond to certain questions posed in the Court's July 30, 2026 letter (ECF No. 1576) that were not discussed at the hearing.

**Amphitheater Market Definition**

- Plaintiffs did not identify any evidence responsive to the Court's question (Question No. 2 to Plaintiffs) about what evidence there is in the trial record concerning "'what the artist would do if the cost of performing in an amphitheater began to rise,'" ECF No. 1576 (quoting *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 683 (4th Cir. 2016)). Plaintiffs instead cited an analysis by Dr. Hill where he found that artists who perform a tour in large amphitheaters often do the same for their next summer tour. July 31, 2026 Hr'g Tr. ("Hr'g Tr.") 11:14-23. At most, Dr. Hill's study shows that there are some repeat purchasers, which—in addition to being unsurprising—does not address how artist choices might *change* if amphitheaters became more expensive or less remunerative. Plaintiffs intended to address that question through Dr. Hill's Hypothetical Monopolist Test, but it was excluded as unreliable, in part because Dr. Hill's method for measuring "diversion" did not "measure anything … to suggest the artist's reaction to a price hike or worsening of terms." ECF No. 1037 at 9-10, 12.

- Plaintiffs continue to argue that there are some artists with a strong preference for "large amphitheaters" without ever saying how many there are. Dr. Hill's study doesn't say anything about the number of such artists, because it's a fraction of an unknown size denominator. It was Plaintiffs' burden to show not only that some artists prefer large amphitheaters, but that "this captive group is substantial enough that a hypothetical monopolist would find it profitable to impose … an increase in price." *See United States v. Sungard Data Sys., Inc.*, 172 F. Supp. 2d 172, 191-92 (D.D.C. 2001); *see also United States v. Engelhard Corp.*, 126 F.3d 1302, 1306-07 (11th Cir. 1997).

1

**Amphitheater Monopoly Maintenance**

- In response to Question No. 6 to Plaintiffs, asking Plaintiffs to "display" the evidence of the "acquisitions and their terms that occurred during the limitations period," ECF No. 1576 at 2, Plaintiffs' counsel offered a litany of evidence that in one way or another *references* Live Nation amphitheaters. *See* Hr'g Tr. 46:2-48:20. That was not the question as we understood it. In Defendants' Rule 50 briefing, we noted that Plaintiffs had not even bothered to lay a foundation for the Fourth Claim for Relief by establishing the basic facts about the acquisitions and booking agreements they challenged (in or out of the limitations period). Question No. 6 appeared responsive to that argument. But the snippets of testimony and documents cited by counsel say nothing specific about the acquisitions or their terms—most of them don't even establish the *dates* of the acquisitions, whether they involved "large amphitheaters" as defined by Plaintiffs, or whether Live Nation even gained "control" of the venue. *See* **Exhibit A** (chart summarizing cited evidence).[1]

- To put this issue in context, the discussion of this claim in Dr. Hill's expert report was built on the contention that, "[b]y 2024, Live Nation had gained control over 16 major concert amphitheaters it did not control in 2015." Hill Report ¶ 381. His Figures 82 and 83 state that in this period Live Nation acquired ownership of two large amphitheaters (in 2017), obtained two new leases (in 2016 and 2021), and acquired a management agreement for one amphitheater in 2020. *Id.* ¶¶ 381-82. The other eleven "acquisitions" were booking deals. The only "acquisitions" in 2020 or later were the one management agreement, the 2021 lease, and three booking deals. *Id.* To answer the Court's question, Plaintiffs should have identified and displayed the evidence about those deals. And more importantly, they should have done that through some coherent and meaningful presentation at trial. The only thing that Dr. Hill argued at trial is that *in the aggregate* the new deals (mostly booking deals) were greater than the number of newly-built large amphitheaters in this period. Trial Tr. 2136:8-20, 2268:18-2269:10, 2271:2-4.

- The authorities "suggest[ing] that an acquisition by a monopolist is presumptively anticompetitive conduct" (ECF No. 1576 at 3) do not apply here. In the first place, the jury was not given any such instruction; it was told "a company's control over or acquisition of amphitheaters does not, without more, count as anticompetitive conduct." ECF No. 1411-24, Jury Instruction ("JI") No. 24. Furthermore, the presumption at most applies to the acquisition of *actual or nascent competitors*. *See Fed. Trade Comm'n v. Meta Platforms, Inc.*, 775 F. Supp. 3d 16, 58 (D.D.C. 2024) ("[T]he acquisition of actual competitors or nascent threats by a monopoly is 'the type of conduct that is reasonably capable of

---

[1] For example, Plaintiffs' counsel cited testimony from Mr. Roux to support the assertion that Live Nation entered an exclusive booking agreement with Ford Idaho Center in 2023. Hr'g Tr. 47:2-3. But Mr. Roux merely testified, "I know we book into [the venue]," without confirming the year any agreement was entered or whether it's exclusive. Trial Tr. 1243:7-10. Plaintiffs' counsel also mentioned the American Family Insurance Amphitheater, but all Mr. Roux said about it—when asked whether it's "exclusively booked by Live Nation"—was, "I'm not sure about that one." Trial Tr. 1242:4-10; *see also* PX0592 (no indication of whether the venue is owned, leased, operated, or exclusively booked).

contributing significantly to a defendant's continued monopoly power.'" (citation omitted)).[2]

- At last week's hearing, Plaintiffs appeared to argue that the acquisitions resulted in an anticompetitive effect on *promoters*—meaning that this is now a *vertical* acquisition theory. *See* Hr'g Tr. 52:3-6, 53:7-11. Vertical merger challenges are famously difficult because "[v]ertical integration is not an unlawful or even suspect category under the antitrust laws." *Reazin v. Blue Cross & Blue Shield of Kan., Inc.*, 663 F. Supp. 1360, 1489 (D. Kan. 1987), *aff'd in part & remanded in part*, 899 F.2d 951 (10th Cir. 1990). There is no presumption of harm from vertical mergers. *Fed. Trade Comm'n v. IQVIA Holdings Inc.*, 710 F. Supp. 3d 329, 351 (S.D.N.Y. 2024) ("[I]n a vertical merger case, 'the government must make a fact-specific showing that the proposed merger is likely to be anticompetitive.'" (citation omitted)). Regardless, Plaintiffs did not put on that vertical effects case. They have no right to argue now that the jury figured this out for itself. *See Aghaeepour v. N. Leasing Sys., Inc.*, 763 F. Supp. 3d 580, 588 (S.D.N.Y. 2025) ("A court is to defer to a jury's reasonable inferences but can give no deference to impermissible speculation.").

- In the case of acquisitions of *actual* competitors, the presumption is simply an extension of the rule derived from *United States v. Philadelphia National Bank*, that a horizontal merger that "produces a firm controlling an undue percentage share of the relevant market" is presumptively anticompetitive. 374 U.S. 321, 363 (1963). But even then, the plaintiff is obligated to present the structural case, which here was never done for acquisitions and long-term leases alone. There is no evidence in this record that the single "acquisition" in the limitations period (the 2021 lease of Hayden Homes Amphitheater)[3] even triggered the *Philadelphia National Bank* presumption.

- As for *nascent* competitors, they get special treatment because "[i]t will commonly be difficult if not impossible to prove that a firm is a 'unique' and 'truly probable' potential entrant." Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, ¶ 701d. But while Plaintiffs pleaded a nascent competitors theory, *see* Am. Comp. ¶ 69 (ECF No. 257), no

---

[2] As discussed at the hearing, the "reasonably appears capable of" standard—which comes from *United States v. Microsoft Corp.*, 253 F.3d 34, 79 (D.C. Cir. 2001), does not apply here. *Microsoft* made clear that its holding was limited to "actions seeking injunctive relief." *Id.* Subsequent cases likewise limited this standard to where "a regulator is seeking only injunctive relief." *United States v. Google LLC*, 747 F. Supp. 3d 1, 152-53 (D.D.C. 2024); *see FTC v. Qualcomm Inc.*, 969 F.3d 974, 987 (9th Cir. 2020) (noting this standard in case involving permanent injunction).

[3] Dr. Hill's report indicates that Live Nation leased Hayden Homes Amphitheater as of 2022, Hill Rebuttal Report, fig. 163, but he did not present that information to the jury. Two fact witnesses—including Marney Smith, General Manager of Hayden Homes Amphitheater—testified that Live Nation has a booking deal with the venue. M. Smith Dep. 13:19-14:03; Trial Tr. 1242:19-23 (Roux). This proves Defendants' point: the record is hopelessly confused on the nature of Live Nation's "control" of this unidentified set of amphitheaters.

effort was made at trial to connect those allegations to any of the acquisitions within the limitations period.

- Plaintiffs' theory of harm is premised on the idea that exclusive booking rights are on par with acquisitions because the booker "controls" the content that plays at these venues. The evidence does not support this. First and foremost, Plaintiffs did not put any booking agreements into evidence. Dr. Hill didn't even review the booking agreements, Trial Tr. 2269:19-25, so his assertion that Live Nation "controls" these exclusively booked amphitheaters is entitled to no weight. What little we know about them comes from Ben Weeden (who runs Live Nation's amphitheater business) and Colin Lewis (a Live Nation promoter), who both testified that Live Nation's exclusive booking agreements sometimes allow non-Live Nation shows to play at the venue. *See* Trial Tr. 3677:24-3678:4 (Weeden) ("It will depend on what the deal is, but there are definitely exclusive booking agreements that would allow carve-outs for third-party promoters."); Trial Tr. 1990:3-7 (Lewis) ("With the exclusively booked venues, … owners sometimes program them. So it wouldn't necessarily be under Live Nation.").

- At the hearing, Plaintiffs suggested that Defendants presented no evidence of procompetitive effects. That is wrong. There was testimony about benefits from the Hayden Homes deal, M. Smith Dep. 13:19-33:22, and Defendants' expert, Prof. Yurukoglu, presented substantial evidence of the procompetitive effects of Live Nation's vertical integration as a promoter and venue owner/operator. Trial Tr. 4290:20-25, 4291:22-4292:2, 4330:15-4332:5, 4353:16-24 (lower ticket prices, more tickets sold, fewer dark days, higher artist compensation). Plaintiffs have no evidence of harm that could possibly outweigh this evidence.

- Finally, the Court asked (Question No. 2 to Defendants) about an "inertial consequences" argument relating to Defendants' point that the amphitheater monopolization claim is barred by the statute of limitations and laches. ECF No. 1576 at 2. Defendants did not make an "inertial consequences" argument; that language comes from Plaintiffs' brief. *See* ECF No. 1528 at 6 n.4. Defendants' point is that pre-2020 acquisitions can no longer be challenged, and a plaintiff is not allowed to do that indirectly through a "continuing violations" theory. The continuing violations doctrine does not apply in the merger context. *See Midwestern Mach. Co. v. Nw. Airlines, Inc.*, 392 F.3d 265, 269-72 (8th Cir. 2004); *see also Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elecs. Corp.*, 518 F.2d 913, 929 (9th Cir. 1975) ("ITT cannot justify viewing GTE's acquisitions together as a continuing violation of the antitrust laws in order to avoid the defense of laches. If GTE's early acquisitions had the effect ITT contends they had, ITT cannot belatedly challenge them on the theory that they are now to be appraised collectively with the more recent ones as part of a continuing acquisition program."). Plaintiffs also have no way to disaggregate the effects of the lawful (pre-limitations period) acquisitions from the allegedly unlawful ones, which compounds their failure of proof. *See CSX Transp., Inc. v. Norfolk S. Ry. Co.*, 114 F.4th 280, 291-92 (4th Cir. 2024).

4

**Tying Claim**

- At the hearing, Plaintiffs' counsel cited evidence showing, as a general matter, that there is demand for other promoters, which suggests that artists who use other promoters might want to continue to use them when they play Live Nation amphitheaters. *See* Hr'g Tr. 27:6-32:2.[4]  To the extent that is true, it would mean that Live Nation's unwillingness to rent its amphitheaters to rivals could frustrate some artists.  However, the issue before the Court is whether there is substantial evidence of tying, and Plaintiffs can't point to a single instance where an artist came to Live Nation asking to play an amphitheater, the artist was told no, and, notwithstanding its desire to "mix and match," the artist had Live Nation promote its shows.  To the contrary, the evidence at trial demonstrated that artists are typically better off choosing to have their shows promoted by an amphitheater owner because that allows artists to tap into more revenue streams and negotiate better deals.  Trial Tr. 4243:9-11 (Capshaw) ("you're going to make a better deal if you are dealing directly with the party that controls the venue"); *see also* Trial Tr. 4245:20-25 (Capshaw); Trial Tr. 4325:9-14 (Yurukoglu).  In this context, one cannot simply assume that artists chose Live Nation unwillingly.  That needed to be proven.

- Plaintiffs now seem to acknowledge that their tying claim requires a finding of anticompetitive effects in a properly defined tied market, but to meet that requirement they asserted a market no one has ever referenced in this case: a "separate market for larger amp tours, especially these national amp tours."  Hr'g Tr. 44:3-14.  Plaintiffs' counsel made the extraordinary suggestion that the "jury had a right to find" that this market existed, *id.*, even though Plaintiffs never mentioned this "market" to the jury nor attempted to define it.  Of course that is wrong.  And the supposed anticompetitive effects in this market are undocumented in the trial record—there is no evidence of which tours were lost and when.  Indeed, as the Court pointed out, Plaintiffs didn't have a "single artist" come in and testify that "this is horrible," and they "didn't have Mr. Messina come in and offer the testimony that the Court referenced in summary judgment where Mr. Messina said he wasn't able to promote in the amphitheater industry because of this policy, which would have plausibly gone to anticompetitive effects."  Hr'g Tr. 35:18-24.

- The contrast between Plaintiffs' anticompetitive effects evidence and *Cumulus Media New Holdings Inc. v. Nielsen Company* could not be greater.  *See* 2026 WL 2014972, at *14 (2d Cir. July 13, 2026) (finding Nielsen's conduct had impaired its lone rival "from achieving any measure of scale or industry-wide acceptance" in the tied market).  At most, the evidence is that a thriving competitor, AEG, might have lost an occasional tour—which no one identified.  That is not a substantial adverse effect on competition.

---

[4] Plaintiffs referenced the Greek Theater in Los Angeles multiple times at the hearing and in their Rule 50(b) brief, in connection with their coercion and anticompetitive effects arguments.  *See, e.g.*, ECF No. 1528 (Pls.' Rule 50(b) Opp.) at 8-10; Hr'g Tr. at 32.  Notably, the evidence in the trial record demonstrates that the Greek Theater is not even in Plaintiffs' "large amphitheaters" market: its capacity is 5,900 seats (below the 8,000-capacity threshold).  DX-0738 at -5965, -6049.

**Ticketing Market Definition**

- Every case we are aware of that applied a targeted customer theory to a product market question turned on tangible product or service characteristics that determined the acceptable supplier set for the allegedly targeted customers. These cases are about the unique fit between certain products and the needs of certain customers, and products or services that do not appeal to customers in the targeted group, either at all or enough to prohibit price discrimination, are not in the market. *See DOJ & FTC Horizontal Merger Guidelines* (2010) § 4.1.4 (in the hypothetical "market for glass containers used to package baby food," which is defined around a set of customers—baby food manufacturers—who would not substitute to plastic or metal containers in response to a price increase for glass containers, the suppliers are limited to those who make glass containers). Prominent examples include:

  - *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 41-42 (D.D.C. 2015) (excluding regional broadliners from the national-customer market since "[r]egional distributors, because of their limited footprints, do not have the capacity to serve customers with multi-regional needs across all of their locations," and "[o]nly Sysco and USF have that capacity").

  - *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 224-25 (D.D.C. 2017) (excluding regional carriers from the national-accounts market because "only the four 'large national carriers' can deliver effectively in the vast majority of geographies," and a regional carrier "is a regional player that cannot expand nationally" and therefore "would be bidding on a portion" of an account at most).

  - *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 137 (D.D.C. 2016) (excluding regional and local office-supply vendors from the large-B-to-B market because they lacked the nationwide desktop-delivery and IT capabilities that Staples and Office Depot possessed).

  - *FTC v. Meta Platforms, Inc.*, 775 F. Supp. 3d 16, 37-45 (D.D.C. 2024) (finding personal-social-networking submarket where Meta's products exhibited "peculiar characteristics"—a social graph and design features built around real-identity friends-and-family connections—that served a specific use case not served by competing platforms built around professional or interest-based connections).

  - *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 57-58 n.6 (D.D.C. 2018) (excluding ship chandlers and industrial water-treatment suppliers from the Global Fleets market because they lacked the "total solution" of global logistics, technical support, and port-by-port product availability that defendants supplied).

  - *FTC v. Whole Foods Market, Inc.*, 548 F.3d 1028, 1039-40, 1045 (D.C. Cir. 2008) (excluding conventional supermarkets from the premium natural-and-organic submarket).

6

- Here, there is no dispute that the same set of competitors service amphitheaters, arenas and stadiums (e.g., Ticketmaster, AXS, and SeatGeek). Plaintiffs' targeted customer theory dramatically affects market shares, but the ticketing choices available to large venues of all types are the same. If the Court upholds the jury verdict here, it would be the first ever targeted market case in which a narrow product market was justified even though the *same suppliers* are servicing customers in the market and outside the market.[5] And it would be based on a record that has none of the serious economic analysis that normally accompanies a DOJ or FTC targeted market analysis. *See, e.g.*, *Anthem*, 236 F. Supp. 3d at 198-201 (HMT/SSNIP test); *Staples*, 290 F. Supp. 3d at 121-23 (same); *Sysco*, 113 F. Supp. 3d at 44-46 (same); *Wilhelmsen*, 341 F. Supp. 3d at 57-58 (same); *see also United States v. Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d 1, 26-27, 34-35 (D.D.C. 2022) (Dr. Hill performed an HMT/SSNIP test, HHI analysis, diversion ratio analysis, merger simulation, and GUPPI analysis in support of the government's market definition).

- There is no question that Plaintiffs' MCV market is based not on differences in primary ticketing systems, but rather the alleged reliance of MCVs on concerts. Trial Tr. 2083:12-15 (Hill). At multiple levels, concerts define these markets. At the hearing, the Court asked Plaintiffs about one of those limitations: why they imposed "any cutoff" on their MCV market—i.e., why they limited it to arenas and amphitheaters with 10+ concerts per year even though, "on the logic that [Plaintiffs] are describing, arenas and amphitheaters are just naturally conducive to concerts." Hr'g Tr. at 82:8-19. The answer was revealed by Dr. Carlton, who found that Ticketmaster's share of primary ticketing (including sports) at MCVs with 8,000+ capacity that hosted *at least one* concert is just 48%. Trial Tr. 4034:19-23. All of these "concert" limitations, whether it is this 10+ concerts restriction on venues or only calculating shares based on tickets to concerts, are means to turn market shares that preclude a finding of monopoly into one that strongly infers monopoly. The categorical exclusion of stadiums—even those that host more than 10 concerts a year—is for the same purpose. Adjusting Dr. Hill's market to include stadiums brings Ticketmaster's share down to 40%. Trial Tr. 4034:24-4035:2.

**Ticketing Conduct**

- At summary judgment, part of the basis on which the Court allowed Plaintiffs' ticketing monopolization claim to proceed was that "a jury must decide whether the exclusive contracts are the product of coercion (as there's some evidence for) or venue preference (as there's some evidence for)." ECF No. 1037 at 40. Plaintiffs effectively abandoned that claim at trial—there is no evidence that there was any customer who preferred a non-exclusive contract but was forced to take an exclusive contract. Twenty-three venue witnesses testified, and none of them said this happened.

---

[5] *United States v. Eastman Kodak* is different because it involved a question of geographic market definition and the product market (film) was not contested. 63 F.3d 95 (2d Cir. 1995). As in this case, the Government's price discrimination theory affected market shares but not the roster of competitors. Because, as in this case, there was no evidence of price discrimination against the targeted customers, the court found that the relevant geographic market was worldwide. *Id.* at 105-09.

- In such circumstances—where the customers actually prefer exclusivity and competitors have an opportunity to compete for the contracts when they come up—exclusive contracts have not been found unlawful. *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 76-84 (3d Cir. 2010). Might it be possible to find such contracts unlawful? In theory, yes, upon a showing that the adverse effects on competition and consumer welfare *outweighed benefits*. But Plaintiffs have not made that showing.[6]

- Given that there is no connection between the alleged threats and the exclusive nature of the contracts, Plaintiffs' "threats and retaliation" theory needs to stand on its own two feet. It's not clear what the legal theory is, but any of the possible options—tying, conditioning, leveraging—require a showing of market power in a properly defined market for concert promotion. *See* ECF No. 1500 (Defs.' Rule 50(b) Brief) at 23-25. And arguing that this is monopoly leveraging exacerbates this problem. Monopoly leveraging requires proof of monopoly power in the "first" market (which provides the leverage) and at least a dangerous probability of monopolizing the second market. *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 459 (1993); *Virgin Atl. Airways Ltd. v. Brit. Airways PLC*, 257 F.3d 256, 272 (2d Cir. 2001); *see also Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 410 at n. 4 (2004). Plaintiffs' allegations concerning a concert promotions market monopoly failed at summary judgment.

- In all events, it is undisputed that Live Nation promotes thousands of shows in non-Ticketmaster venues. Trial Tr. 1920:22-1921:4 (Rapino). The most that can be reasonably inferred from Dr. Hill's study is a marginal bump in Live Nation shows in Ticketmaster buildings. Plaintiffs have never explained how that could possibly sustain their burden.

**Laches and Statute of Limitations**

- In response to the Court's question (Question No. 1 to both parties) asking whether there was "any dispute that if a claim is time-barred based on the four-year limitations period, then laches would apply to bar any claim for equitable relief," Plaintiffs' counsel stated they did dispute that proposition, contending that "laches requires a factual showing of undue delay and prejudice" "regardless of what the statute of limitations is." July 31, 2026 Hr'g Tr. 104:20-105:21. The Court responded that it "thought it was the opposite." *Id.* at 105:13-16. The Court is correct. While *during* the limitations period the defendant bears the burden of establishing laches, once the statute of limitations has run "a presumption of laches will apply and [the] plaintiff must show why the laches defense ought not be applied in the case." *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 191 (2d Cir. 1996). Consistent with this principle, courts have recognized that the "bare fact of delay" beyond the statute of limitations creates a "presumption of prejudice." *New York v. Facebook, Inc.*,

---

[6] Plaintiffs say that the cases cited by Defendants' counsel "are mostly exclusive dealing cases under Section 1 of the Sherman Act when you are looking at a specific exclusive dealing contract." Hr'g Tr. 91:20-23. Not so; *Race Tires* involved claims under both Section 1 and Section 2. And there are numerous other cases applying similar principles in the context of Section 2 claims involving exclusive dealing. *See, e.g.*, *Microsoft*, 253 F.3d at 58-59; *NicSand v. 3M*, 507 F.3d 442 (6th Cir. 2007); *United States v. Visa*, 788 F. Supp. 3d 585, 609 (S.D.N.Y. 2025).

549 F. Supp. 3d 6, 37 (D.D.C. 2021); *see also Chalmers v. National Collegiate Athletic Association*, 2025 WL 3628416, at \*5 (2d Cir. 2025) (holding that "presumption of laches" applied where "plaintiffs' claims for injunctive relief accrued more than four years before they sued").

**Retroactive Misjoinder**

- Like Plaintiffs, we have been unable to find authority for a civil-case version of retroactive misjoinder. That said, there is no reason why the equitable considerations that underlie that doctrine could not be applied in a Rule 59 setting, in which courts routinely address the prejudice from evidence that was improperly admitted. We can find no authority stating that questions concerning prejudice must be siloed within claims. And here, Plaintiffs literally asked the jury to define Live Nation by these Slack messages about premium parking and the like. They sought the maximum prejudicial value from them.

**Response to Amicus Brief re: Dr. Abrantes-Metz**

- The economist amicus brief (ECF No. 1527) does not, and cannot, absolve Dr. Abrantes-Metz of her failure to analyze the impact of upfront payments.

- No one disagrees with the general economic principle that fixed costs do not affect marginal pricing. And no one is saying, as Plaintiffs' counsel suggested, "I don't believe in industrial organization economics." July 31, 2026 Hr'g Tr. 102:2-3. But whenever an economist purports to apply economic expertise to a case, she has to do so in a way that fits the actual market dynamics that the record reflects. *Klein v. Meta Platforms, Inc.*, 766 F. Supp. 3d 956, 964-67 (N.D. Cal. Feb. 13, 2025); *see also, e.g.*, *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266-70 (2d Cir. 2002).

- Dr. Abrantes-Metz, and Plaintiffs' amici, did not do so. They act as if all they need to know to determine that a payment does not affect marginal pricing is that it is, in some sense, fixed. Plaintiffs' counsel argued that, without exception, the economic argument compels the conclusion that fixed payments do not count. But the unanimous testimony at trial from every ticketing industry witness is that they do not set ticketing services prices that way.

- Specifically, the evidence showed that primary ticketing contracts with major venues invariably have some two-way flow of money, all negotiated and agreed at the same time. Trial Tr. 2569:17-2571:20 (Abrantes-Metz); Trial Tr. 3183:8-3814:4 (J. Johnson); PX0764; DX-0404; DX-1393(79); DX-1394(5). The contracts govern years of expected ticketing opportunities.

- Every venue demands that some of the expected value of the contract to its ticketer be paid up front in various ways. As a result, one of the ways that ticketers compete to obtain those contracts is by offering large upfront payments to the venues. Trial Tr. 2275:11-15 (Hill); Trial Tr. 2569:17-2570:17 (Abrantes-Metz); Trial Tr. 3820:14-25, 3821:12-20 (J. Johnson). Ticketers are willing to make these payments so long as their share of ticket

fees is sufficient to recoup the upfront payments, cover their other costs, and meet their profit goals. Inherently, therefore, upfront payments directly affect the split of ticketing revenues; they are absolutely interrelated. Trial Tr. 1177:14-19 (Marciano); Trial Tr. 2921:15-24 (Marcus); Trial Tr. 3820:14-25 (J. Johnson); Glickman Dep. Tr. 53:20-54:5; Briggs Dep Tr. 25:15-26:4; Marion Dep. Tr. 72:6-73:18.

- Ticketmaster, itself, analyzes every proposed ticketing contract in a standard template (the "DAT") that expressly (and in multiple ways) offsets payments to the venue and Ticketmaster's share of ticket fees. E.g., PX0764; DX-0404; Trial Tr. 3820:14-25, 3845:8-3848:8 (J. Johnson) (discussing DX-0404). Those DATs implicitly treat the entire ticketing opportunity as Ticketmaster's marginal unit of production and therefore contract acquisition costs as incremental costs. Under GAAP, "costs that an entity incurs to obtain a contract with a customer that it would not have incurred if the contract had not been obtained" are normally classified as incremental costs. FASB, Accounting Standards Codification 340-40-25-2.

- The amici (like Dr. Abrantes-Metz) fundamentally err by treating the ticketing fee ultimately charged to the fan as the "marginal price." But Dr. Abrantes-Metz is clear that the price she is analyzing in the essential first step of her model is the price that ticketers charge *to venues* for ticketing services. That is the ticketer's share of the economic benefits of the ticketing contract—revenues received *less upfront payments*.

- This is a classic instance of economists coming in with broad economic principles but not tethering them to the real facts about the markets at issue. That is not sufficient for Dr. Abrantes-Metz's testimony to stand. *In re NFL "Sunday Ticket" Antitrust Litig.*, 2024 WL 3628118, at *6-7 (C.D. Cal. Aug. 1, 2024), *appeal argued*, No. 24-6107 (9th Cir. Mar. 9, 2026) (excluding expert testimony based on "*ipse dixit* opinion untethered to an economic analysis of what would have likely occurred in the but-for world"); *Klein*, 766 F. Supp. at 964-67 (excluding expert testimony concerning antitrust injury based on a theoretical conception of price inconsistent with market realities); *see also Joiner*, 522 U.S. at 146.

*[signatures on following page]*

Dated:  August 4, 2026

Respectfully submitted,

LATHAM & WATKINS LLP

CRAVATH, SWAINE & MOORE LLP

_____

_____

Andrew M. Gass (admitted *pro hac vice*)
Alfred C. Pfeiffer (admitted *pro hac vice*)
   *Co-Lead Trial Counsel*
David R. Marriott
   *Co-Lead Trial Counsel*
Timothy L. O'Mara (admitted *pro hac vice*)
Jennifer L. Giordano
Kelly S. Fayne (admitted *pro hac vice*)
Lindsey S. Champlin (admitted *pro hac vice*)
Robin L. Gushman (admitted *pro hac vice*)

Lauren A. Moskowitz
Jesse M. Weiss
Nicole M. Peles

Two Manhattan West
375 Ninth Avenue
New York, NY 10001
(212) 474-1000

505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600

lmoskowitz@cravath.com
jweiss@cravath.com
npeles@cravath.com

1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

*Attorneys for Defendants Live Nation
Entertainment, Inc. and Ticketmaster L.L.C.*

555 11th Street, NW, Suite 1000
Washington, D.C. 20004
(202) 637-2200

Al.Pfeiffer@lw.com
David.Marriott@lw.com
Andrew.Gass@lw.com
Tim.O'Mara@lw.com
Jennifer.Giordano@lw.com
Kelly.Fayne@lw.com
Lindsey.Champlin@lw.com
Robin.Gushman@lw.com

*Attorneys for Defendants Live Nation
Entertainment, Inc. and Ticketmaster L.L.C.*

cc:     All counsel of record (via ECF)