# EXHIBIT A

**Via Email**

David Teslicko
Acting Chief, Financial Services, Fintech, and Banking Section
Antitrust Division,
United States Department of Justice
450 Fifth St. NW, Suite 4000
Washington, DC 20530
LiveNationPublicComment@usdoj.gov

**RE: United States of America, et al. v. Live Nation Entertainment, Inc. and Ticketmaster L.L.C., Case No. 1:24-cv-03973-AS (S.D.N.Y.)**

Dear Mr. Teslicko,

Anschutz Entertainment Group, Inc. ("AEG") respectfully submits this public comment pursuant to the Antitrust Procedures and Penalties Act, 15 U.S.C. §§ 16(b)-(h) (the "Tunney Act") and the procedures set forth in the Federal Register, 91 FR 41330.

## I. INTRODUCTION

AEG is one of Live Nation's and Ticketmaster's principal competitors in both concert promotion and primary ticketing services, and AEG also owns and operates major entertainment venues, including Crypto.com Arena in Los Angeles. Since entry of the 2010 and 2020 consent decrees, AEG has observed firsthand the limitations of the behavioral remedies imposed on Live Nation and Ticketmaster, as well as the practical difficulties of detecting and remedying the company's exclusionary conduct. AEG is therefore uniquely positioned to assess whether the Proposed Final Judgment ("Proposed Decree") is likely to restore competition and prevent the recurrence of the conduct alleged in the operative Complaint.[1]

The Proposed Decree asks the Court to trust a remedy that has already failed twice—a remedy that therefore cannot plausibly be in the public interest. The 2010 and 2020 consent decrees both sought to address harm caused by the merger of Live Nation and Ticketmaster in substantially the same primary-ticketing market proved at trial in 2026. Both relied on behavioral restrictions that would supposedly prevent the combined company from using its market power to exclude rival ticketing companies. Both came with assurances that competition would be restored. And both failed. By 2020, DOJ had identified repeated violations involving Live Nation threats to withhold content from venues considering alternatives to Ticketmaster. By 2024, DOJ alleged that Defendants had violated both decrees, and the non-settling states proved the point at trial.

That history underscores the central question pending before the Court: why should the Court expect an eight-year consent decree imposing behavioral restrictions to succeed where fifteen years of similar restrictions failed?

---

[1] AEG's comments focus primarily on the Proposed Decree's provisions affecting the ticketing industry. AEG also incorporates by reference the submission of Louis Messina, which addresses issues concerning the Proposed Decree's amphitheater and booking provisions.

Indeed, the Merger Remedies Manual published by the first Trump administration's DOJ explained the general rule that structural relief (i.e., divestiture of Ticketmaster) is the preferred remedy and that "[s]tand-alone conduct relief is appropriate only when the parties prove that: (1) a transaction generates significant efficiencies that cannot be achieved without the merger; (2) a structural remedy is not possible; (3) the conduct remedy will completely cure the anticompetitive harm, and (4) the remedy can be enforced effectively."[2] Of course, we now know that none of these are true of the Live Nation / Ticketmaster merger. No efficiencies were ever proven, a structural remedy is not only possible but necessary, we know that conduct remedies have failed for fifteen years, and we know that the consent decree imposing those remedies could not be enforced effectively.

The Proposed Decree differs from the prior failed decrees in form, not in substance. It leaves intact—indeed, it *protects*—Live Nation's anticompetitive flywheel: venues will continue to sign up for Ticketmaster exclusive contracts so they do not lose valuable Live Nation shows. The threat need not be spoken to be effective. As long as Live Nation controls the concerts venues need, venues will still pick Ticketmaster—not because Ticketmaster wins on price, service, or innovation, but because venues cannot afford the cost of choosing an alternative like AXS or SeatGeek. That pressure is even harder to resist because Ticketmaster shares a portion of its monopoly profits from ticketing fees with venues.

The Proposed Decree touts an "open distribution" system, but, shockingly, allows Ticketmaster to continue locking up the market for primary ticketing at Major Concert Venues with exclusive four-year contracts that block competitors in perpetuity. The price Live Nation pays for maintaining that exclusivity is minuscule: venues may (but are not required to) permit a Ticketmaster competitor to sell tickets for a *single* event each year. In other words, the Proposed Decree locks in Ticketmaster's monopoly for approximately 85 percent of the market, or about 6,500 events out of 7,500 events per year. It theoretically opens up only about 170 new events per year for ticketing competitors—a mere 2 percent of event counts at Major Concert Venues—but only if competitors can convince the venues to overlook the content threat and agree to use their single event hall pass. But it gets even worse. The supposed "open distribution" system is all built on Ticketmaster's own "back-end" software infrastructure. In other words, the only "competition" the Proposed Decree appears to create is competition to sell Ticketmaster tickets on Ticketmaster's own system. But of course that is not competition at all. The entire point of Plaintiffs' lawsuit was that Live Nation extracted monopoly profits from ticketing fees at the expense of artists and fans. Nothing in the Proposed Decree appears to prevent Ticketmaster from charging the same excessive ticketing fees for that single event where a venue allows a competitor to sell a ticket off Ticketmaster's back-end system. And the fees may even be *higher* because that ticketing competitor will need to charge something on top of Ticketmaster's fees to stay in business. Put simply, the Proposed Decree does not break Ticketmaster's grip; it tightens it.

Any theoretical justification for Ticketmaster's exclusive contracts that may have existed back in 2010 is irrelevant today. Ticketmaster once defended exclusive contracts by pointing to the equipment, staffing, and training needed to run a box office. But in 2026, tickets are digital, scanners are handheld, and platforms run in the cloud. A major venue can use one ticketing

---

[2] Merger Remedies Manual, Antitrust Division, United States Department of Justice (September 2020) *available at* https://www.justice.gov/atr/page/file/1312416/dl. The manual was repealed by the Biden administration in April 2022.

company tonight, another tomorrow, or multiple providers for the same show—as some venues already do, particularly in other countries where Ticketmaster has not locked up the market. In a competitive market, artists and other rightsholders could choose the ticketing company (or companies) that best serves each event. Competition would eliminate Ticketmaster's monopoly profits derived from ticketing fees and drive those fees closer to the couple of dollars that it actually costs to provide ticketing services, with the savings passed along to the artist and the fans. The Proposed Decree instead protects a broken live music industry in the United States for another eight years by allowing Live Nation to lock out competition with four-year exclusive ticketing contracts, generating the monopoly profits it has used for the past fifteen years to squeeze out independent promoters, ticketing companies, and venue owners.

And perhaps this should come as no surprise. The deal was reportedly made at secret Oval Office meetings between President Trump and Live Nation CEO Michael Rapino. Discussions in open court revealed that DOJ agreed to the settlement without even notifying its trial team. From AEG's perspective, it looks like Live Nation largely wrote its new consent decree, same as the old consent decree, without meaningful influence from DOJ, in an effort to cement its monopoly well into the future.

It is inconceivable that the Tunney Act permits the Court to give twice-failed remedies a third chance. Instead, the statute asks whether the judgment will protect the public interest. The Proposed Decree will disserve that interest. It leaves Live Nation's content leverage intact, preserves Ticketmaster's exclusive venue lockup, fails to protect fans from monopoly ticketing fees, risks making Ticketmaster the industry gatekeeper through its so-called "open distribution" system, and compounds those flaws with inadequate duration, monitoring, penalties, and enforcement tools. A consent decree should remove illegal barriers to entry, not reinforce them. If these barriers are removed, capital will enter, competition will emerge, and consumers will benefit. There is little likelihood with the Proposed Decree that these barriers will fall.

Accordingly, AEG respectfully requests that the Court decline to enter the Proposed Decree.

## II. FACTUAL BACKGROUND

### A. The 2010 Consent Decree Did Not Stop Live Nation from Using Concerts to Protect Ticketmaster's Dominance

In 2010, DOJ approved the merger of Live Nation, the nation's largest concert promoter, and Ticketmaster, the nation's largest primary ticketing provider—combining Live Nation's control over must-have concert content with Ticketmaster's dominance in ticketing. Am. Compl. ¶ 65.[3] DOJ recognized the risk that the merged company could use Live Nation's promotion business to protect Ticketmaster's ticketing monopoly. *Id.*; *see also* Final Judgment, *United States et al. v. Ticketmaster Ent., Inc*., et al., No. 1:10-cv-00139 (D.D.C. July 30, 2010), ECF No. 15 ("2010 Final Judgment"). The 2010 Final Judgment therefore imposed prohibitions on Live Nation retaliating

---

[3] AEG has cited the court record and publicly available materials where available. AEG also provides additional facts relevant to the Court's assessment of the Proposed Decree and will provide the underlying documents or declarations upon request by DOJ or the Court.

against venues for considering rival ticketing providers, among other things. *See* 2010 Final Judgment at 8-21.

But the decree never reached the structural problem. Ticketmaster already had long-term exclusive contracts with major venues, and Live Nation still controlled the concerts those venues needed. Venues therefore understood that choosing a Ticketmaster rival could cost them Live Nation content—a risk confirmed at trial. *See, e.g.*, Abbamondi, Trial Tr. at 238:16-239:17; Helgerson, Trial Tr. 399:8-12; Groetzinger, Trial Tr. 764:2-22. That kind of implicit pressure is precisely what behavioral remedies cannot reliably police.

The market results were telling. Since the merger, AXS has been unable to win a single ticketing contract at an NBA or NHL arena unaffiliated with AEG, despite repeated efforts. Perez, Trial Tr. 2382:15-17. Venues that considered switching from Ticketmaster to AXS—including KFC Yum! Center, Oracle Arena, and State Farm Arena—declined to do so because they feared losing Live Nation content; another venue, Vivint Arena, moved from AXS to Ticketmaster to attract more Live Nation shows. None of those venues pointed to AXS's technology or client service as the reason for choosing Ticketmaster.

The threat was also not theoretical. When Gwinnett Center, an AXS venue, asked why Live Nation had booked a show elsewhere and whether there was an issue, a Live Nation representative responded: "Issue? – three letters. Can you guess what they are?" After Staples Center switched from Ticketmaster to AXS, Live Nation shows declined significantly. Marciano, Trial Tr. 1122:5-13. And when Xcel Energy Center considered leaving Ticketmaster, Live Nation threatened to "move all of their shows to the competitive venue across the river." Helgerson, Trial Tr. 397:16-398:3.

DOJ later identified the same pattern when it moved to modify the 2010 decree. In one example, Live Nation warned a venue that it would lose concerts if it selected a competing ticketing provider; after the venue switched, Live Nation booked no shows there. Motion to Modify Final Judgment and Enter Amended Final Judgment, *United States et al. v. Ticketmaster Ent., Inc., et al.*, No. 1:10-cv-00139 (D.D.C. Jan. 8, 2020), ECF No. 22 at 7. In another, Ticketmaster's president warned that the response would be "nuclear" and that "Live Nation would never do a show." *Id.* at 8-9.

Moreover, the 2010 decree was impossible to monitor and enforce, just like the Proposed Decree would be. Venues had little reason to report Live Nation's violations to the court-appointed monitor because Live Nation carried both a carrot and a stick. To protect its monopoly, Ticketmaster shared a portion of its monopoly profits from ticketing fees with venues in exchange for the venue agreeing to an exclusive contract (the carrot) and the venue knew it would lose Live Nation shows if it did not (the stick). Ticketmaster and Live Nation used the carrot and stick to align venue incentives with the company's own dominance—at the expense of artists, fans, and competition. The 2010 decree failed because it left those incentives untouched.

**B. The 2020 Consent Decree Confirmed That Stronger Behavioral Promises Still Would Not Work**

The 2010 decree was supposed to expire in 2020. Instead, DOJ concluded that Live Nation had engaged in the very retaliation the decree was designed to prevent. *See* Motion to Modify Final Judgment at 6-10.

DOJ extended the decree in 2020, adding additional compliance and monitoring obligations. But the amended decree left the same structure in place: Live Nation still controlled must-have content, and Ticketmaster still controlled the exclusive ticketing contracts.

The same pattern thus continued. Ticketmaster maintained its long-term exclusive agreements. Am. Compl. ¶¶ 88-112. Venues continued to view Ticketmaster as the safer choice for preserving Live Nation shows. Gwinnett Center switched from AXS to Ticketmaster expecting more Live Nation events. Perez, Trial Tr. 2329:17-2330:12. H-E-B Center returned to Ticketmaster after Live Nation threatened to withhold content. *Id*. 2430:22-2431:2; Evans, Trial Tr. 1693:10-1697:10. Barclays saw Live Nation content decline after switching to SeatGeek and return after switching back to Ticketmaster. Abbamondi, Trial Tr. 265:6-9; Jacoby, Trial Tr. 3536:12-20.

Rivals adjusted to that reality. SeatGeek offered "retaliation insurance," and AXS proposed non-exclusive arrangements that would let venues keep Ticketmaster for Live Nation events while using AXS for others. Groetzinger, Trial Tr. 764:2-22; Perez, Trial Tr. 2327:22-2336:1. Competitors were not just competing against Ticketmaster's product; they were competing against Live Nation's unlawful content leverage.

**C. The 2024 Complaint Showed That Fifteen Years of Oversight Had Not Solved the Problem**

In 2024, DOJ and state attorneys general filed this lawsuit, alleging the same conduct the prior decrees were supposed to stop: Live Nation's use of concert promotion to protect Ticketmaster's exclusive ticketing contracts with venues. Am. Compl. ¶¶ 88-112. The Complaint also alleged that Live Nation tied artists' access to its amphitheaters to the use of its promotion services. *Id.* ¶¶ 113-116. DOJ alleged that Defendants had committed "additional, different, and more expansive violations" than the conduct addressed in 2010. *Id*. ¶ 67.

The numbers underscore the problem. Live Nation supplies approximately 60 percent of concerts at Major Concert Venues, while Ticketmaster's exclusive contracts account for more than 60 percent of ticket sales—and more than 75 percent of concert ticket sales—at those venues. *Id*. ¶¶ 33, 88, 197. That combination gives Defendants both the content leverage and the exclusive lockup on ticketing needed to suppress competition. Ticketmaster then entrenched that foreclosure by locking in early renewals before rivals had a meaningful chance to compete. *Id*. ¶ 102.

After fifteen years of failed oversight, DOJ at first did not seek merely another promise of better behavior. It sought structural relief, including divestiture of Ticketmaster and an injunction against the exclusivity provisions that foreclosed rival ticketing companies. *Id*. ¶ 517.

**D. The Proposed Decree Walks Away from the Structural Relief the Complaint Said Was Necessary**

Shockingly, DOJ's Proposed Decree completely reverses course, abandoning the entire case it brought in favor of extending failed behavioral remedies for another eight years. The Proposed Decree does not require divestiture, does nothing to dismantle Ticketmaster's venue lockup, and does not remove Live Nation's incentive to use content to protect Ticketmaster.

Instead, the Proposed Decree returns to behavioral restrictions resembling the prior decrees—the same type of remedy the Complaint alleged had already failed.

The Proposed Decree again prohibits retaliation, conditioning, and content steering. *See* Proposed Decree §§ VI.A-B. But it also gives Live Nation broad exceptions for decisions based on perceived ticketing "capabilities" or ordinary-course considerations such as projected demand or production requirements. *Id.* §§ II.H & II.Z. Those subjective carveouts are easy to invoke and hard to disprove.

The Proposed Decree leaves substantially all Ticketmaster exclusives intact. It allows venues subject to exclusive contracts with up to four years remaining to use a rival ticketing company for just one event per year (if the venue elects to do so). If a venue has more than four years remaining on its exclusive, then the venue could elect to sell up to 20 percent of its inventory through a rival ticketing company. *Id.* §§ IV.H, IV.I, IV.K. Ticketmaster can easily keep its monopoly intact with successive four-year exclusive contracts—the Proposed Decree expressly permits them. *Id.* § IV.K.2. The Proposed Decree does not prohibit Ticketmaster from soliciting or negotiating early renewals, notwithstanding representations in the parties' term sheet. *Compare id.* §§ IV.G, IV.L *with* Term Sheet § 2(f).

The Proposed Decree requires Ticketmaster to develop a so-called "open distribution" system that allows only established ticketing providers selected by a venue to integrate with Ticketmaster's back-end infrastructure to sell Ticketmaster tickets off its system. Proposed Decree §§ II.I & IV.A–C. Ticketmaster may deny integration to any provider it believes lacks the capability to service Major Concert Venues, with disputes subject to review by the monitor and, ultimately, the Court. *Id.* §§ II.I, IV.E. While Ticketmaster may not impose *additional* fees on purchases through an integrated competitor, the Proposed Decree appears to leave intact Ticketmaster's *existing* excessive ticketing fees on each ticket sold, and even allows Ticketmaster to charge competitors additional integration-related fees at a rate approved by the monitor. *Id.* § IV.B.1. In other words, under the Proposed Decree, ticketing fees are only going to go up—not down. While the Proposed Decree limits Ticketmaster's use of competitively sensitive data obtained through these integrations, those protections disappear when the Proposed Decree expires. *See id.* § IV.F. Worse, Ticketmaster may share that data with senior executives, in-house counsel, and other personnel whose responsibilities may include competitive decision-making, subject only to a compliance plan reviewed by DOJ. *See id.* §§ II.J, II.K & VII.B-E. Competing ticketing providers receive neither notice nor an opportunity to object to those disclosures of their own sensitive data.

The non-settling states and the District of Columbia proceeded to trial. The jury found for them on all claims, confirming that Defendants unlawfully acquired and maintained monopoly power and harmed competition in primary ticketing at Major Concert Venues and in the market for large

amphitheaters. Verdict Form, ECF No. 1417. Those states now seek structural relief, including divestiture of Ticketmaster, prohibitions on long-term exclusives, divestiture of Live Nation-owned amphitheaters, and prohibitions on Live Nation's amphitheater tying practices. Plaintiff States' Proposed Remedies and Discovery at 1-3, ECF No. 1497-1.

That sequence is decisive. DOJ's Complaint, the trial record, and the jury verdict all point to the same conclusion: behavioral rules have not neutralized Live Nation's content leverage or Ticketmaster's venue lockup. The Proposed Decree asks the Court to approve another version of a remedy that has already failed twice. The Court should not fall for the bait.

## III. LEGAL STANDARD

The Tunney Act requires the court to "determine the entry of [any consent] judgment is in the public interest." 15 U.S.C. § 16(e)(1). The court must consider:

> (A) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and
>
> (B) the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

*Id.* "[T]he settlement of [the] civil action for nothing more than the nuisance value of [the] litigation is not in the public interest[.]" *United States v. SG Interests I, Ltd.*, No. 12-cv-00395-RPM, ECF No. 20 (D. Colo. Dec. 12, 2012) (order denying motion for entry of final judgment under the Tunney Act).

## IV. THE PROPOSED DECREE FAILS THE PUBLIC-INTEREST TEST BECAUSE IT PRESERVES THE VERY MARKET POWER THE CASE WAS BROUGHT TO END

The Proposed Decree fails the Tunney Act's public-interest standard. It leaves Live Nation's content leverage intact, preserves Ticketmaster's exclusive venue lockup, leaves fans exposed to monopoly fees and potentially higher costs, risks entrenching Ticketmaster as the industry gatekeeper through the "open distribution" system, and compounds those flaws through inadequate duration, monitoring, enforcement, penalties, and release provisions. Together, these defects would preserve the market conditions that allowed Defendants to acquire and maintain monopoly power.

### A. The Proposed Decree Leaves Live Nation's Content Leverage—the Core Coercive Force Behind Ticketmaster's Dominance—Untouched

The Complaint and trial record identify Live Nation's control over content as the coercive force that protects Ticketmaster's dominance. Am. Compl. ¶¶ 88-98; Groetzinger, Trial Tr. 752:4-19; Khoury, Trial Tr. 1649:4-15. The Proposed Decree does not eliminate that force. It leaves Live

Nation's market power in promotions intact, keeps Ticketmaster in the same corporate family, and relies on failed rules forbidding retaliation and steering. Venues will still understand the same message: choosing a Ticketmaster rival puts Live Nation shows at risk.

That pressure is so powerful it rarely needs to be explicit. As the Complaint alleges, Live Nation's reputation for retaliation is so well known that it need not always threaten venues directly. *Id.* ¶ 89. Informal pressure, implicit understandings, and industry expectations are difficult to detect and harder to prove. The prior decrees failed for that reason. Repeating the same approach for a *third time* provides no basis to conclude the conduct will stop.

The Proposed Decree also gives Live Nation ready-made defenses. It permits decisions based on a ticketing provider's supposed "capabilities" or ordinary-course factors such as projected demand and production requirements. Proposed Decree §§ II.H, II.Z. Those exceptions are broad, subjective, and easy to invoke after the fact—especially where Live Nation has long argued that Ticketmaster's rivals are inferior despite trial evidence and the jury's verdict to the contrary. *See* Defs.' Letter Mot. Expedite, ECF No. 1427. Only the divestiture of Ticketmaster—the remedy DOJ initially sought—addresses this structural problem.

Divestiture clearly falls squarely within the Court's equitable authority. The Supreme Court has described divestiture as "the most important of antitrust remedies" and has rejected conduct remedies that cannot address the many ways improper influence may operate. *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 326, 330–34 (1961); *see also Ford Motor Co. v. United States*, 405 U.S. 562, 571–74 (1972) (ordering divestiture where necessary to eliminate Ford's "incentive to perpetuate" arrangements that "maintain[ed] the virtually insurmountable barriers to entry to the aftermarket"). The same principle applies here: conduct rules cannot neutralize the incentives created by Live Nation and Ticketmaster's integrated structure.

The bottom line is simple: as long as Ticketmaster remains vertically integrated with Live Nation, venues will continue to face pressure to choose Ticketmaster because of Live Nation's control over content. The Proposed Decree does not address that fundamental incentive structure. Divestiture is needed to restore competition.

### B. The Proposed Decree Leaves Ticketmaster's Exclusive Venue Lockup Intact—and Calls That Competition

The Proposed Decree also preserves Ticketmaster's long-term exclusive agreements. Those agreements are not incidental; they are the mechanism by which Ticketmaster blocks rival ticketing companies from serving Major Concert Venues.

First, exclusives limit competition to the small number of contracts that happen to expire in any given year. Ticketmaster's contracts lock up roughly 72 percent of major concert venues for an average of 5.6 years, making entry costly and rare. Hill, Trial Tr. 2107:7-24; Perez, Trial Tr. 2324:18-2325:8. That foreclosure explains why only a handful of meaningful competitors have emerged at Major Concert Venues over the last fifteen years. Perez, Trial Tr. 2317:2-2318:14.

Second, exclusives force every event in a venue onto the same ticketing platform, blocking specialized providers from competing for particular categories of events, such as platforms specifically designed for sports season tickets or high-volume concert onsales. That limits product

differentiation, innovation, and the ability of artists or teams to choose a platform better suited to their needs. Perez, Trial Tr. 2323:23-2325:5.

Third, exclusives deny artists and rightsholders the ability to use one or more ticketing companies of their choice, even where another ticketing company offers better service, better technology, lower fees, or broader distribution. Van Stone, Trial Tr. 3290:21-3293:14; Groetzinger, Trial Tr. 762:10-17; Luter Dep. Designations at 111:6-20, ECF No. 1496-16. The result is less innovation, more disruption, and excessive ticketing fees based on a percentage of the face value of the ticket that far exceed the actual cost of providing the ticketing service. Am. Compl. ¶ 5; Rapino, Trial Tr. 1778:7-1779:8; Hill, Trial Tr. 2124:14–2125:14; Abrantes-Metz, Trial Tr. 2452:8–17.

Experience in other countries shows the competition that Ticketmaster's exclusivity suppresses in the United States. For example, ticketing fees are far lower in the United Kingdom and France than in the United States, where Ticketmaster's venue exclusives dominate. Perez, Trial Tr. 2238:2-7; Yovich, Trial Tr. 2802:11-2803:15. In those other markets, multiple ticketing providers can sell for the same event, giving fans lower-fee options and giving artists greater control over distribution. Perez, Trial Tr. 2339:18-2340:16. European venues also "have a lot more content going, a lot more shows going through it, because there's more promoters, there's more ticketing companies. Fans are rewarded because they have more choices." Marciano, Trial Tr. 1123:10-13. Nothing about technology prevents the same non-exclusive model from delivering the same competitive benefits here. *Id*. 956:13-957:2.

The Proposed Decree's supposed fixes barely scratch the surface. Allowing one alternative-ticketing event per year is a token exception that, even if venues chose to exercise the option, would amount to only about 170 shows out of 7,500 in Major Concert Venues per year. The limited exception for contracts with more than four years remaining is equally narrow: it applies only if a venue opts in and only for up to 20 percent of inventory. Proposed Decree §§ IV.H, IV.I, IV.K. That condition makes the relief largely illusory because venues that share in Ticketmaster's supracompetitive fees—and risk losing Live Nation content—have little or no incentive to invoke it. And for contracts with less than four years remaining, Ticketmaster may continue demanding exclusivity, leaving its anticompetitive scheme entirely intact. Moreover, even when rivals make sales on Ticketmaster's so-called "open distribution" system for their single allocated event per year, those transactions apparently will still run through Ticketmaster's back-end, allowing Ticketmaster to collect its excessive ticketing fees even though fans are ostensibly buying elsewhere. Such narrow exceptions to exclusivity do not afford rivals a realistic chance to prove their capabilities, build lasting venue relationships, or gain the scale needed to compete effectively. And they do nothing to provide artists and fans with the benefits of real competition.

The Proposed Decree also fails to stop early renewals, another tool that shields Ticketmaster from competition. Ticketmaster may still solicit renewals before contracts expire and use financial incentives to reward employees for locking venues in early. Johnson, Trial Tr. 3899:24-3900:2; *id*. 3923:24-3924:12. Rivals therefore may never receive a meaningful chance to compete.

An effective remedy must prohibit Ticketmaster's long-term exclusive agreements with Major Concert Venues. Eliminating those provisions would restore real bidding, allow artists, venues, and other rightsholders to choose among competing ticketing providers, and give fans the benefits of lower fees, better service, and greater innovation. Competition would let rightsholders discipline

excessive ticketing fees, demand improved technology and service quality, and tailor ticketing arrangements to each event. It would also help venues attract a broader range of artists and events with different ticketing preferences, increasing output and consumer choice. Venues operating without exclusive ticketing, such as the Greek Theatre in Los Angeles, already show that this model can succeed by attracting diverse artists and increasing concert volume. Ending long-term exclusivity would extend those benefits across the industry, producing stronger competition and better outcomes for artists, venues, and fans.

Indeed, where companies unlawfully use exclusive contracts to block competitors from access to the market, the standard remedy is an injunction prohibiting the exclusivity provisions. *See, e.g.*, *United States, et al. v. Google*, No. 20-cv-3010, ECF No. 1436 (D.D.C. Sept. 2, 2025) (enjoining "Google's use of exclusive agreement to distribute its [General Search Engine]"); *McWane, Inc. v. F.T.C.*, 783 F.3d 814 (11th Cir. 2015) (affirming injunction preventing McWane from "implementing or enforcing any condition, policy, or practice requiring exclusivity with a customer"); *United States v. Dentsply Int'l, Inc*., No. 99-cv-005 (D. Del. April 26, 2006) ("Dentsply shall not require any dealer to be, or agree with any dealer that it will become, an exclusive Dentsply tooth dealer.").

### C. The Proposed Decree Leaves Fans Paying Ticketmaster's Monopoly Fees—and May Make Them Pay More

The Proposed Decree also leaves untouched one of the clearest harms in the case: Ticketmaster's excessive fees. Trial evidence showed that Ticketmaster's fees exceed both the cost of service and the fees charged by rivals, and that fees rise when venues switch to Ticketmaster and fall when they switch away. Rapino, Trial Tr. 1778:7-1779:8; Hill, Trial Tr. 2124:14–2125:14; Abrantes-Metz, Trial Tr. 2452:8–17.

The fees are the monopoly profits from Live Nation's unlawful conduct. Yet the Proposed Decree does not cut them and may make them worse. Outside Live Nation amphitheaters, the Proposed Decree imposes no cap on Ticketmaster's service fees, does not require Ticketmaster to reduce fees on tickets sold through integrated providers, and gives artists, venues, and fans no practical way to constrain those fees through price competition. The Proposed Decree's ban on "additional" ticketing fees merely prevents Ticketmaster from adding a new surcharge on top of its existing fee structure. Ticketmaster apparently may still charge the same ticketing fees on every ticket sold through its so-called "open distribution" system, and may also charge additional "integration" fees to the integrated competitor—costs that consumers will ultimately bear. Proposed Decree § IV.B.1. For example, if Ticketmaster charges a $45 service fee for an arena ticket today, nothing in the Proposed Decree appears to prevent it from charging that same fee, even if the ticket is sold by a competitor on Ticketmaster's back-end system. Because integrated providers must also cover Ticketmaster's integration charges, fans could pay more overall—Ticketmaster's existing fee plus the rival provider's added costs. In that scenario, total service charges could exceed today's $45 fee. The result is perverse: the Proposed Decree preserves Ticketmaster's supracompetitive fees and may leave fans paying even *higher* total fees.

The Proposed Decree does set a 15 percent ticketing fee cap for Live Nation amphitheaters. Proposed Decree § IV.J. But this concession is telling. Because Live Nation is the promoter, ticketer, and venue owner at the amphitheaters, it can simply increase the face value of the ticket

to offset whatever revenue it loses from the 15 percent ticketing fee cap. The fact that Live Nation is refusing to impose a similar 15 percent ticketing fee cap in arenas where it does not control the promotions or the venue clearly signals that fees are not going down as a result of this Proposed Decree. Moreover, in other countries without exclusive contracts, the average ticketing fees are already below the Proposed Decree's limited 15 percent cap—about 12.5 percent in the United Kingdom and 10 percent in France.

A remedy that leaves Ticketmaster's supracompetitive fees intact—and that does nothing to restore competition that would reduce those fees—fails to protect consumers and is not in the public interest. At a minimum, an effective decree must bar Ticketmaster from charging or retaining ticketing fees on tickets sold through its "open distribution" system, prohibit integration charges that operate as an added layer of supracompetitive fees, and allow artists, venues, and fans to benefit from genuine fee competition among ticketing providers. The Proposed Decree does none of that.

### D. The Proposed Decree Risks Entrenching Ticketmaster as the Industry Gatekeeper Rather Than Restoring Competition

The Proposed Decree's interoperability provisions create another problem: they appear designed to make rivals dependent on Ticketmaster's back-end infrastructure to reinforce (rather than reduce) Ticketmaster's monopoly. Rather than freeing the market, the Proposed Decree risks making Ticketmaster the gatekeeper through which competing providers must operate. Ticketmaster may charge integration-related fees, raising rivals' costs and weakening their ability to compete. Proposed Decree § VI.J. The Proposed Decree then asks the monitor and the Court to police those pricing terms—an administrability burden courts are poorly suited to bear. *See Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 452 (2009) (quoting *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004)) ("[Courts are] ill suited 'to act as central planners, identifying the proper price, quantity, and other terms of dealing.'").

The Proposed Decree would let Ticketmaster decide who may connect to its system, deny integration to would-be entrants, and force rivals into a costly, time-consuming dispute process before they can compete. And once the Proposed Decree expires, Ticketmaster would be free to deny or restrict integration altogether. Ticketmaster has already used similar gatekeeper power abroad. In France, ticketing is generally promoter-driven: promoters choose their preferred providers and often use multiple platforms to maximize reach and sales. But major venues such as Paris La Défense Arena and Accor Arena have appointed Ticketmaster to manage ticket sales through its back-end system. That position gives Ticketmaster control over whether competing ticketing providers receive access and on what terms. Only integrated providers can technically sell tickets for those venues, and Ticketmaster has largely denied that access. Only Fnac and another rival, Digitick—now See Tickets—obtained access; Digitick obtained that access only after legal action nearly two decades ago. The Proposed Decree risks enshrining Ticketmaster as an integration gatekeeper into the already broken live music industry in the United States, making rivals dependent on Ticketmaster's infrastructure, and allowing them to compete only with Ticketmaster's permission.

The data risk is just as serious. Integration would give Ticketmaster a window into its rivals' consumer, transaction, and competitively sensitive information. Even during the Proposed

Decree's term, Ticketmaster's senior officials could access competitors' commercially sensitive data; after the Proposed Decree expires, Ticketmaster would be free to exploit the advantages accumulated through those integrations. Courts have long recognized why that matters: access to rivals' information can reduce uncertainty about their strategies, enable monitoring of competitive responses, facilitate price coordination, and inflict irreparable competitive harm. *See, e.g.*, *U.S. v. Container Corp.*, 393 U.S. 333, 337 (1969) ("The exchange of price data tends toward price uniformity"); *United States v. Amodeo*, 71 F.3d 1044, 1051 (2d Cir. 1995) ("Commercial competitors seeking an advantage over rivals need not be indulged in the name of monitoring the courts"); *Encyclopedia Brown Prods., Ltd. v. Home Box Office, Inc.*, 26 F. Supp. 2d 606, 614 (S.D.N.Y. 1998) ("Confidential business information dating back even a decade or more may provide valuable insights into a company's current business practices that a competitor would seek to exploit.").

The supposed multi-provider option is no answer. Although the Proposed Decree ostensibly allows venues to use more than one back-end system if they choose to forego an exclusive contract with Ticketmaster, that option is unlikely to be meaningful in practice because Live Nation's content threat would disincentivize such a choice. And any venue that uses multiple providers must still include Ticketmaster's back end. That requirement deprives venues of the full benefits of better competing technologies. Trial evidence showed that Ticketmaster's system lagged behind rivals such as SeatGeek. Mr. Abbamondi testified that "SeatGeek's back-end technology was much more powerful than Ticketmaster's." Trial Tr. 234:22-235:1. Ticketmaster's system limited venues to 32 price codes, while SeatGeek's allowed venues to create essentially unlimited price codes and use more sophisticated pricing strategies. *Id*. 235:11-236:9. Mr. Khoury, Ticketmaster's former Vice President of Engineering and Senior Director, testified that Ticketmaster's back end suffered recurring "capacity issues," required nightly restarts, and was so outdated and "brittle" that "[e]very change will break so many other things," unlike Jump's competing system. *Id.* 1616:25-1619:15. Live Nation's CEO, Michael Rapino, likewise admitted that Ticketmaster's technology was held together with "duct tape." *Id*. 1862:11-15. Requiring rivals to operate through that infrastructure would entrench an inferior platform as the industry standard.

Nor is forced integration necessary. In markets without exclusive arrangements, multiple ticketing providers sell tickets effectively without relying on a shared back-end system. In the United Kingdom—the world's second-largest live entertainment market—venues and promoters routinely work with several non-integrated providers, each selling a defined ticket allocation through its own platform. Providers receive specified seat inventories, and any reallocations during the sales process are made by the event organizer, not by a centralized system controlled by one provider. Venue access works the same way: each provider issues its own barcode or mobile credential, and access-control systems recognize tickets issued by all authorized providers.

DOJ says integration will promote competition by separating primary ticketing's back-end and marketplace functions. Competitive Impact Statement at 9, ECF No. 1539. But that separation is unnecessary where providers can distribute tickets independently—and harmful where it makes every rival depend on Ticketmaster to compete.

In short, the Proposed Decree risks transforming Ticketmaster's dominance from a market problem into a court-sanctioned platform dependency.

### E. The Proposed Decree's Duration, Monitoring, Enforcement, Penalties, and Release Provisions Make an Inadequate Remedy Even Worse

The Proposed Decree's oversight provisions make it even less consistent with the public interest. Its term is too short, the monitor's authority too limited, the prior monitor unsuitable, the penalties too weak, and the release provisions troubling because they purport to extinguish private claims without adequate safeguards. These provisions confirm that the Proposed Decree even lacks the tools needed to police even the limited behavioral obligations it imposes. *See* 15 U.S.C. § 16(e)(1)(B).

**Duration.** The Proposed Decree's eight-year term is inadequate because time alone cannot cure an unchanged market dynamic. The prior decrees remained in place for fifteen years and still failed to prevent recurring violations. A shorter term built on the same behavioral model offers no meaningful assurance that the conduct will not recur. The relief must be far longer to ensure that those anticompetitive incentives do not result in harm to competition or consumers, such as permanent structural relief in the form of a divestiture. *See United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 226-232 (D.D.C. 1982), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (approving a consent Proposed Decree without a sunset provision under the Tunney Act).

**Monitor authority.** The monitor's authority is too narrow to address the problem identified in the Complaint. The history of this case shows that Live Nation's anticompetitive conduct cannot be reduced to a checklist of specific prohibitions. The prior consent decrees "failed to restrain Live Nation and Ticketmaster from violating other antitrust laws in increasingly serious ways." *See* Am. Compl. ¶ 67. To protect the public interest, the monitor should be empowered to assess Live Nation's antitrust compliance more broadly, including conduct that may not technically violate a particular Proposed Decree provision but nevertheless undermines competition.

**Monitor appointment.** The parties' stated intent to retain the prior monitor is contrary to the public interest. Proposed Decree § XI.A. The prior consent decrees remained in effect for fifteen years, yet Live Nation allegedly violated both the prior decrees and the antitrust laws during that period. Am. Compl. ¶ 13. The prior monitor failed to prevent or address the conduct that gave rise to this lawsuit and cannot reasonably be presumed to provide adequate protection going forward. The prior monitor's law firm also apparently represents Live Nation investors, creating a potential conflict of interest. The Court should appoint a new independent monitor.

**Penalties.** The proposed penalties are too small to matter. An $18 million payment and a $5 million penalty per violation will not change Live Nation's incentives. *See* Proposed Decree §§ XIX.A-C, XVIII.E. Live Nation generated more than $25 billion in revenue last year, and it repeatedly violated the 2020 consent decree despite a $3 million payment and a $1 million penalty per violation. A modest increase in penalties does not fix the problem. Where violations are hard to detect and the rewards of anticompetitive conduct are substantial, penalties must be large enough to deter, not merely to price in the risk of getting caught. The Proposed Decree falls well short. *See SG Interests I*, No. 12-cv-00395-RPM, ECF No. 20 (D. Colo. Dec. 12, 2012) (rejecting the settlement under the Tunney Act, in part, because "[t]here is no basis for saying that the approval of these settlements would act as a deterrence to defendants and others in the industry."). Although DOJ identified numerous prior decree violations and more than fifteen years of alleged

misconduct, the Proposed Decree's $18 million payment is less than the penalty for four future violations and amounts to under 0.1 percent of Live Nation's annual revenue.

**Release provisions.** The release provisions raise a separate and serious problem: they appear to extinguish consumers' private claims without the protections those consumers ordinarily receive. The Proposed Decree purports to release not only the settling states' claims, but also claims belonging to individual consumers residing in those states, even though a related class action remains pending. *See* Proposed Decree § XIX.A. The Tunney Act allows the Court to review settlements proposed by the United States; it does not authorize the compromise of nonparty private claims without adequate procedural safeguards. 15 U.S.C. § 16(e)(1). Arkansas law illustrates the point. Arkansas, one of the settling states, requires court approval of any *parens patriae* settlement after notice, opt-out, and objection procedures resembling class-action protections. Ark. Code Ann. § 4-75-315. Those safeguards also require scrutiny of attorneys' fees and settlement allocations to protect consumers' interests. *See In re TFT-LCD (Flat Panel) Antitrust Litigation*, 2012 WL 9336090 (N.D. Cal.). Approving the release through this Tunney Act proceeding would bypass those protections, especially where the settling states retain discretion over settlement allocation and only part of the recovery may reach consumers. The Proposed Decree also leaves the settling states and injured private parties with no apparent mechanism to seek inquiry into future decree violations.

## V. CONCLUSION

The Court should reject the Proposed Decree. The record is clear: two consent decrees failed, DOJ subsequently sought structural relief as a result, the jury confirmed the competitive harm, and yet DOJ has flip-flopped back to the same behavioral restrictions that have already proved inadequate. Real competition requires a remedy that reaches the source of the problem. At minimum, that means eliminating the vertical integration between Live Nation and Ticketmaster and prohibiting Ticketmaster's long-term exclusive contracts with Major Concert Venues. Without those measures, the same market conditions will remain, fans will keep paying monopoly ticketing fees, rivals will remain dependent on Ticketmaster, and recurrence of Live Nation's antitrust violations is certain.

Respectfully submitted,

Anschutz Entertainment Group, Inc.