# EXHIBIT 1

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

IN RE: NATIONAL FOOTBALL LEAGUE'S "SUNDAY TICKET" ANTITRUST LITIGATION

---

NINTH INNING INC., doing business as The Mucky Duck; for itself and for all others similarly situated; 1465 3RD AVE. REST. CORP., doing business as Gael Pub; ROBERT GARY LIPPINCOTT, Jr.; JONATHAN FRANTZ, On Behalf of Themselves and the Residential and Commercial Classes,

*Plaintiffs - Appellants*,

v.

NATIONAL FOOTBALL LEAGUE, INC; NFL ENTERPRISES LLC; ARIZONA CARDINALS HOLDINGS, INC.; ATLANTA FALCONS FOOTBALL CLUB LLC; BALTIMORE RAVENS LIMITED PARTNERSHIP; BUCCANEERS LIMITED

No. 24-5493

D.C. No. 2:15-ml-02668-PSG-SK

OPINION

PARTNERSHIP; BUFFALO BILLS, LLC; CHARGERS FOOTBALL CO., LLC; CHICAGO BEARS FOOTBALL CLUB INC; CINCINNATI BENGALS INC; CLEVELAND BROWNS FOOTBALL COMPANY, LLC; DALLAS COWBOYS FOOTBALL CLUB LTD; DETROIT LIONS INC; FOOTBALL NORTHWEST LLC; SAN FRANCISCO FORTY NINERS II, LLC; GREEN BAY PACKERS, INC.; HOUSTON NFL HOLDINGS LP; INDIANAPOLIS COLTS INC.; JACKSONVILLE JAGUARS LLC; KANSAS CITY CHIEFS FOOTBALL CLUB, INC; MIAMI DOLPHINS LTD; MINNESOTA VIKINGS FOOTBALL CLUB LLC; NEW ENGLAND PATRIOTS, LP; NEW ORLEANS LOUISIANA SAINTS LLC; NEW YORK FOOTBALL GIANTS INC; NEW YORK JETS LLC; PANTHERS FOOTBALL LLC; PDB SPORTS LTD, d/b/a Denver Broncos Football Club; PHILADELPHIA EAGLES FOOTBALL CLUB, INC.; PITTSBURGH STEELERS SPORTS, INC; RAIDERS FOOTBALL CLUB LLC; TENNESSEE FOOTBALL, INC.;

WASHINGTON FOOTBALL, INC.; DIRECTV, LLC; DIRECTV SPORTS NETWORKS, LLC; DIRECTV HOLDINGS LLC,

*Defendants - Appellees,*

---------------------------------------

ESPN, INC.; PARAMOUNT GLOBAL, INC.,

*Intervenors.*

IN RE: NATIONAL FOOTBALL LEAGUE'S "SUNDAY TICKET" ANTITRUST LITIGATION

No. 24-5691

D.C. No. 2:15-ml-02668-PSG-SK

NINTH INNING INC.; 1465 3RD AVE. REST. CORP.; ROBERT GARY LIPPINCOTT, Jr.; JONATHAN FRANTZ,

*Plaintiffs - Appellees,*

v.

PDB SPORTS LTD; PHILADELPHIA EAGLES FOOTBALL CLUB, INC.; PITTSBURGH STEELERS

SPORTS, INC; NATIONAL FOOTBALL LEAGUE, INC; NFL ENTERPRISES LLC; ARIZONA CARDINALS HOLDINGS, INC.; ATLANTA FALCONS FOOTBALL CLUB LLC; BALTIMORE RAVENS LIMITED PARTNERSHIP; BUCCANEERS LIMITED PARTNERSHIP; BUFFALO BILLS, LLC; CHARGERS FOOTBALL CO., LLC; CHICAGO BEARS FOOTBALL CLUB INC; CINCINNATI BENGALS INC; CLEVELAND BROWNS FOOTBALL COMPANY, LLC; DALLAS COWBOYS FOOTBALL CLUB LTD; DETROIT LIONS INC; FOOTBALL NORTHWEST LLC; SAN FRANCISCO FORTY NINERS II, LLC; GREEN BAY PACKERS, INC.; HOUSTON NFL HOLDINGS LP; INDIANAPOLIS COLTS INC.; JACKSONVILLE JAGUARS LLC; KANSAS CITY CHIEFS FOOTBALL CLUB, INC; MIAMI DOLPHINS LTD; MINNESOTA VIKINGS FOOTBALL CLUB LLC; NEW ENGLAND PATRIOTS, LP; NEW ORLEANS LOUISIANA SAINTS LLC; NEW YORK FOOTBALL GIANTS INC; NEW YORK JETS

LLC; PANTHERS FOOTBALL LLC; RAIDERS FOOTBALL CLUB LLC; TENNESSEE FOOTBALL, INC.; WASHINGTON FOOTBALL, INC.,

*Defendants - Appellants*,

and

DIRECTV, LLC, DIRECTV SPORTS NETWORKS, LLC, DIRECTV HOLDINGS LLC,

*Defendants*,

-------------------------------------

ESPN, INC.; PARAMOUNT GLOBAL, INC.,

*Intervenors*.

Appeal from the United States District Court
for the Central District of California
Philip S. Gutierrez, District Judge, Presiding

Argued and Submitted March 9, 2026
San Francisco, California

Filed October 30, 2026

Before: Holly A. Thomas and Anthony D. Johnstone, Circuit Judges, and Joan H. Lefkow, District Judge.*

Opinion by Judge Johnstone

## SUMMARY**

### Antitrust

The panel reversed the district court's judgment as a matter of law for the National Football League and affirmed the district court's order granting a new trial on damages in an antitrust class action brought under Sections 1 and 2 of the Sherman Act by a class of DirecTV subscribers.

Using expert testimony, the subscribers won a multi-billion-dollar verdict on their claims that the NFL's anticompetitive agreements caused them to pay inflated prices for "Sunday Ticket," a bundled package of NFL game telecasts. The district court excluded the subscribers' expert testimony as unfounded and unreliable. Without that testimony, the subscribers could no longer prove their antitrust claims, and so the district court granted the NFL's motion for judgment as a matter of law. In the alternative, the district court ordered a new trial on damages, finding that

* The Honorable Joan H. Lefkow, United States District Judge for the Northern District of Illinois, sitting by designation.

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Case 1:24-cv-03973-AS Document 1599-1 Filed 11/02/26 Page 8 of 3
Case: 24-5691, 10/30/2026, DktEntry: 205.1, (7 of 32)



the jury fumbled its calculations, resulting in an award that the evidence did not support.

The panel held that the district court abused its discretion by excluding the subscribers' expert testimony regarding antitrust injury and damages. The panel held that expert opinions are neither unfounded nor unreliable merely because they are impeachable. By inquiring beyond the reliability of the experts' methods and the sufficiency of their data, the district court exceeded its gatekeeping role under Federal Rule of Evidence 702.

The panel held, however, that the district court did not abuse its discretion in finding that the jury improperly considered the expert testimony in its damages award. The district court acted within its discretion when it inferred how the jury arrived at its award, and it was within the district court's discretion to grant the NFL's motion for a new trial because the jury's method of calculating damages showed that the award was not based on a proper consideration of the evidence.

Because the district court's judgment as a matter of law rested on the Rule 702 exclusions, the panel reversed that decision, affirmed the new trial order, and remanded with instructions to reinstate the jury's liability verdict and for a new trial on damages.

The panel addressed additional issues in a concurrently filed memorandum disposition.

## COUNSEL

Amanda K. Bonn (argued), Eliza R. Finley, Kalpana Srinivasan, and Marc M. Seltzer, Susman Godfrey LLP, Los Angeles, California; Ian M. Gore, Susman Godfrey LLP, Seattle, Washington; Steven M. Shepard, William C. Carmody, Samir Doshi, and Seth Ard, Susman Godfrey LLP, New York, New York; Jeffrey A. Lamken, MoloLamken LLP, Washington, D.C.; Eugene A. Sokoloff and Thomas P. Schubert, MoloLamken LLP, Chicago, Illinois; Peter E. Leckman, Langer Grogan & Diver PC, Philadelphia, Pennsylvania; Edward A. Diver and Howard Langer, Langer Grogan & Diver PC, Philadelphia, Pennsylvania; Scott Martin, Hausfeld LLP, New York, New York; Sathya Gosselin, Hausfeld LLP, Washington, D.C.; Christopher L. Lebsock, Hausfeld LLP, San Francisco, California; for Plaintiffs-Appellants.

Paul D. Clement (argued), Niccolo A. Beltramo, Joseph J. DeMott, and Erin E. Murphy, Clement & Murphy PLLC, Alexandria, Virginia; Theodore J. Boutrous Jr., Christopher D. Dusseault, and Daniel G. Swanson, Gibson Dunn & Crutcher LLP, Los Angeles, California; Cynthia Richman, Gibson Dunn & Crutcher LLP, Washington, D.C.; Beth A. Wilkinson, Jennifer P. Swarbrick, Jenna H. Pavelec, Rakesh N. Kilaru, and Brian L. Stekloff, Wilkinson Stekloff LLP, Washington, D.C.; Anastasia Pastan, Milbank LLP, Washington, D.C.; Gregg H. Levy and Derek Ludwin, Covington & Burling LLP, Washington, D.C.; Daniel Petrocelli, Monsura A. Sirajee, and Mark R. Oppenheimer, O'Melveny & Myers LLP, Los Angeles, California; Ian Simmons, O'Melveny & Myers LLP, Washington, D.C.; Dolores F. DiBella, National Football League, New York, New York; for Defendant-Appellees.

Anne Conley, Munger Tolles & Olson LLP, Los Angeles, California; Lisa S. Blatt, Williams & Connolly LLP, Washington, D.C.; Yehudah L. Buchweitz, Weil Gotshal & Manges LLP, New York, New York; for Intervenors.

Lisa S. Blatt, Charles L. McCloud, Christian J. Gladden-Sorensen, and Christopher J. Baldacci, Williams & Connolly LLP, Washington, D.C., for Amici Curiae NFL Media Partners.

Matthew Duncan and Rachel Sommer, Fine Kaplan and Black RPC, Philadelphia, Pennsylvania, for Amici Curiae Evidence and Civil Procedure Scholars.

William S. Hicks and Benjamin Berkowitz, Keker Van Nest & Peters LLP, San Francisco, California; Brian Scarpelli, ACT | The App Association, Washington, D.C.; for Amici Curiae ACT | The App Association, Chamber of Progress, NetChoice, and Civil Justice Association of California.

Daniel E. Haar, Nickolai G. Levin, and L. Allison Herzog, Attorneys; Spencer D. Smith and Alice A. Wang, Counsels; David B. Lawrence, Policy Director; John W. Elias, Deputy Assistant Attorney General; Doha Mekki, Acting Assistant Attorney General; United States Department of Justice, Washington, D.C.; for Amicus Curiae the United States of America.

Patrick F. Madden, Berger Montague PC, Philadelphia, Pennsylvania; Matthew Summers, Berger Montague PC, San Francisco, California; for Amici Curiae Sports Economists.

Daniel E. Gustafson and Anthony J. Stauber, Gustafson Gluek PLLC, Minneapolis, Minnesota; Dennis J. Stewart, Gustafson Gluek PLLC, San Diego, California; for Amici Curiae Antitrust Law Professors.

Amanda G. Lewis, Cuneo Gilbert Flannery & LaDuca LLP, Washington, D.C., for Amicus Curiae Sports Fans Coalition.

Kathleen W. Bradish and Randy Stutz, American Antitrust Institute, Washington, D.C., for Amicus Curiae American Antitrust Institute.

Zac Morgan and Cory Andrews, Washington Legal Foundation, Washington, D.C., for Amicus Curiae Washington Legal Foundation.

Shannon N. Proctor, Eric G. Lasker, and Elyse A. Shimada, Hollingsworth LLP, Washington, D.C., for Amicus Curiae International Association of Defense Counsel.

Michael Schaper, J. Robert Abraham, and Jaime M. Freilich-Fried, Debevoise & Plimpton LLP, New York, New York; Edward D. Hassi, Debevoise & Plimpton LLP, Washington, D.C.; for Amicus Curiae The International Center for Law & Economics.

Lena H. Hughes and Colin Kass, Proskauer Rose LLP, Washington, D.C.; Bradley I. Ruskin, Mark D. Harris, Jake R. Butwin, and Henrique Carneiro, Proskauer Rose LLP, New York, New York; for Amici Curiae Scholars of Antitrust and Sports Law.

Nathaniel L. Bach, Tod Cohen, Benjamin G. Shatz, Dylan Carson, and Benjamin E. Strauss, Manatt Phelps & Phillips LLP, Los Angeles, California, for Amicus Curiae Software & Information Industry Association.

Jason Y. Siu, Jeremy B. Rosen, and Emma Wine, Horvitz & Levy LLP, San Francisco, California, for Amicus Curiae Lawyers for Civil Justice.

Kannon K. Shanmugam, William T. Marks, and Madeline M. McMahon, Paul Weiss Rifkind Wharton & Garrison

LLP, Washington, D.C.; Daniel A. Crane, Louis A. Murray, and Kathleen H. Pierre, Paul Weiss Rifkind Wharton & Garrison LLP, New York, New York; for Amici Curiae Former Antitrust Enforcers.

---

**OPINION**

JOHNSTONE, Circuit Judge:

Antitrust claims often depend on expert testimony to prove a crucial counterfactual: that injury and damages would not have occurred in a world without the claimed anticompetitive conduct. Under Federal Rule of Evidence 702, experts may help a jury envision this "but-for world" by reliably applying reliable methods to sufficient facts to support their opinions. As a gatekeeper for expert testimony, a district court must exclude unfounded or unreliable opinions. But opinions are neither unfounded nor unreliable merely because they are impeachable. Such opinions are for the jury to weigh at trial. Once a jury does so, its verdict must stand unless it is clearly not supported by the evidence.

Using expert testimony, a class of DirecTV subscribers scored a multi-billion-dollar jury verdict in their antitrust case against the National Football League. Those Subscribers claimed that the NFL's anticompetitive agreements caused them to pay inflated prices for "Sunday Ticket," a bundled package of NFL game telecasts unavailable in a subscriber's local market. Economic experts helped the Subscribers prove their injury and damages with a counterfactual: that they paid more for football telecasts than they would have paid but for the NFL's agreements.

After further review, the district court excluded the Subscribers' expert testimony as unfounded and unreliable. Without that testimony, the Subscribers could no longer prove their antitrust claims, so the district court granted the NFL's motion for judgment as a matter of law. In the alternative, the district court ordered a new trial on damages, finding that the jury fumbled its calculations, resulting in an award that the evidence did not support. The Subscribers appeal.

We conclude that the district court abused its discretion by excluding the Subscribers' expert testimony. By inquiring beyond the reliability of the experts' methods and the sufficiency of their data, the district court exceeded its gatekeeping role under Federal Rule of Evidence 702. But the district court did not abuse its discretion in finding that the jury improperly considered the expert testimony in its damages award. Because the judgment rested on the Rule 702 exclusions, we reverse that decision, affirm the new-trial order, and remand with instructions to reinstate the jury's liability verdict and for a new trial on damages.

## I. BACKGROUND

The National Football League is an association of 32 professional football teams. NFL games are among the most popular television programs in the United States: 46 of the top 50 television programs in 2021 were NFL games. The NFL capitalized on this popularity. Between June 2011 and February 2023 (the "Class Period"), the NFL earned more than $100 billion. It amassed most of this fortune by licensing its game telecasts to media distributors. These lucrative licensing agreements are at the heart of this class action.

### A. The NFL's Broadcasting Agreements and the Sports Broadcasting Act

In the NFL's early days, each team controlled its telecasting rights and individually contracted with networks to televise its games. But in 1961, the NFL teams agreed to "pool" their telecasting rights into a single package and share the revenue. The agreement drew a legal challenge, and a district court enjoined the NFL from entering contracts that eliminated competition among teams in selling telecasting rights to their games. *See United States v. NFL*, 196 F. Supp. 445, 447 (E.D. Pa. 1961).

This injunction remained in place until Congress enacted the Sports Broadcasting Act ("SBA"). 15 U.S.C. § 1291. The SBA permits the NFL and other professional sports leagues to jointly sell their rights in the "sponsored telecasting" of their games, exempting those agreements from Section 1 of the Sherman Act. *Id.* We have construed "sponsored telecasting" to mean free over-the-air broadcasts supported by advertising, such as those offered by CBS and Fox. *See In re NFL's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1147 (9th Cir. 2019) ("*NFL Sunday Ticket*"). But "the SBA does not exempt league contracts with cable or satellite television services, for which subscribers are charged a fee, from antitrust liability." *Id.*

### B. The NFL's Three "Interlocking Agreements"

Three related agreements govern the NFL's game telecast marketing: the "Teams-NFL Agreement," the "NFL-Networks Agreements," and the "NFL-DirecTV Agreement." *See NFL Sunday Ticket*, 933 F.3d at 1148. Under the Teams-NFL Agreement, teams pooled their telecasting rights subject to the NFL's control. The NFL then entered into agreements with broadcast networks to telecast

in-market games (the NFL-Networks Agreements) and with DirecTV to telecast out-of-market games (the NFL-DirecTV Agreement). *See id.*

The NFL-Networks Agreements allowed Fox and CBS to produce and telecast Sunday NFL games for free over the air and on basic cable or satellite in select markets. *See id.* These agreements governed telecasting of in-market games, which included the local teams' games. For example, when the Philadelphia Eagles played the Minnesota Vikings, that game was available for free over the air on television in the Philadelphia and Minneapolis local markets. The parties agree that these broadcasts were SBA-protected sponsored telecasts.

But most Sunday NFL games were not available over the air on the local Fox or CBS affiliate. For example, Philadelphia Eagles fans in the Ninth Circuit usually could watch their team for free only when it played a team in the region, like the Los Angeles Rams or Seattle Seahawks. While the in-market games satisfied many viewers, a significant share of NFL fans wanted to watch the out-of-market games played by teams from other regions.

The NFL therefore entered a third agreement with DirecTV to distribute out-of-market telecasts. The NFL-DirecTV Agreement exclusively authorized DirecTV to use its satellite television service to distribute out-of-market telecasts produced by CBS and Fox to DirecTV subscribers who paid an additional annual fee for a "Sunday Ticket" package.

### C. DirecTV Sunday Ticket

A Sunday Ticket package included all the NFL out-of-market telecasts. DirecTV subscribers could buy this

package for an additional price above their regular satellite television subscription. During the class period, Sunday Ticket served 24,105,049 residential subscribers and 506,788 commercial subscribers in the United States. List prices for residential subscribers ranged from $200 to nearly $400 per season, though DirecTV discounted those prices with various promotions. Commercial subscribers like sports bars paid from thousands to over one hundred thousand dollars per season, depending on their establishment's size.

### D. Procedural History

In 2015, the Subscribers sued the NFL and DirecTV, alleging that the NFL's three interlocking agreements violated Sections 1 and 2 of the Sherman Act. 15 U.S.C. §§ 1–2. They alleged that by pooling team telecasting rights in the NFL, then distributing out-of-market telecasts exclusively through DirecTV, the NFL and DirecTV harmed competition and injured the Subscribers. According to the Subscribers, allowing only one distributor and one package for out-of-market telecasts decreased the availability of those telecasts and increased the cost of the telecasts that DirecTV made available.

#### *1. Pretrial*

The Subscribers pleaded several antitrust theories arising out of the interlocking agreements. They acknowledged that, under the SBA, the NFL teams could use the Teams-NFL Agreement to pool their telecasting rights for the "sponsored telecasting" of their games. But they argued that the teams could not pool their telecasting rights when delivering out-of-market games via Sunday Ticket. The Subscribers also challenged the NFL-Networks Agreements' role in the interlocking agreements. They contended that, although the SBA carved out an exception for the NFL's sponsored

telecasts, the NFL-Networks Agreements unlawfully imposed a so-called "NFL Tax" on out-of-market-games to protect the viewership of local games. According to the Subscribers, the NFL-DirecTV Agreement practically required DirecTV to sell out-of-market games at an artificially high "premium" over what it otherwise would have charged.

The district court dismissed the Subscribers' complaint against the NFL for failure to state a claim after compelling arbitration of the Subscribers' claims against DirecTV. Taking each agreement separately, the district court held that because no individual agreement limited the output of game telecasts on its own, the Subscribers could not establish an injury to competition. We reversed. Because "we are required to take a holistic look at how the interlocking agreements actually impact competition," we held that the Subscribers plausibly pleaded that the alleged conduct injured competition. *NFL Sunday Ticket*, 933 F.3d at 1152, 1156–59, *cert. denied*, 592 U.S. 1081 (2020).

On remand, the district court certified two classes of subscribers: a commercial class and a residential class under Federal Rule of Civil Procedure 23(b)(3). In their class-certification motion, the Subscribers offered the expert opinion of economist Dr. Daniel Rascher, who considered how the NFL's interlocking agreements reduced competition and raised prices. Dr. Rascher produced a "yardstick model," which used college football as an analogy for how the NFL telecast market would function without the NFL's anticompetitive conduct. The Subscribers also offered the expert opinion of economist Dr. Douglas Zona, who determined that the class members were overcharged for Sunday Ticket and estimated by how much. The NFL, challenging the reliability of both experts'

opinions and underlying models, moved to exclude them under Federal Rule of Evidence 702. The district court denied the NFL's motions and granted the Subscribers' motion for class certification.

As trial approached, the NFL moved again to exclude Dr. Rascher's and Dr. Zona's expert testimony as unreliable under Rule 702. Again the district court denied both motions.

***2. Trial and Jury Verdict***

At trial, the Subscribers framed their antitrust injury and damages as the overcharge they paid because of the NFL's interlocking agreements. In the Subscribers' case in chief, Dr. Rascher and Dr. Zona testified that the interlocking agreements caused the Subscribers to pay inflated prices. To demonstrate the overcharge, they modeled what the prices would have been for out-of-market games without the anticompetitive conduct. They then compared those prices to what the Subscribers paid. The NFL attacked both experts' testimony on cross-examination, and in a motion for judgment as a matter of law after the Subscribers had been fully heard. *See* Fed. R. Civ. P. 50(a). The district court denied the motion, once more rejecting the NFL's challenge to the Subscribers' experts.

After trial, the jury returned a verdict for the Subscribers. It found the NFL liable on every element of the Subscribers' antitrust claims. The jury awarded damages of $4.6 billion to the residential class and $96 million to the commercial class.

***3. Post-Verdict***

The Subscribers' victory was short-lived. The NFL renewed its motion for judgment as a matter of law, and this

time the district court granted it. *See* Fed. R. Civ. P. 50(b). Despite rejecting the NFL's earlier attempts to exclude Dr. Rascher's and Dr. Zona's expert testimony, the district court determined that their trial testimony was not reliable and so was inadmissible under Rule 702. According to the district court, Dr. Rascher's testimony relied on a model "developed based on speculation and *ipse dixit* opinion." The district court also concluded that the trial had revealed "flaws" in Dr. Zona's models. The district court held that without the excluded expert testimony, it was "impossible for a jury to determine on a class-wide basis that Sunday Ticket subscribers would have indeed paid less in the absence of Defendants' anticompetitive conduct." The district court also conditionally granted a new trial based on "the jury's irrational damages award." *See* Fed. R. Civ. P. 50(c).

The Subscribers appeal.[1] We review de novo a district court's grant of judgment as a matter of law. *Rearden, LLC v. Walt Disney Pictures*, 152 F.4th 1058, 1066 (9th Cir. 2025). We review for abuse of discretion its decisions to exclude expert testimony and to grant a new trial. *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1046 (9th Cir. 2025) (exclusion of testimony); *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1086–87 (9th Cir. 2014) (new trial). "A district court

[1] The Subscribers also appeal the district court's granting the NFL judgment as a matter of law on their injunctive claims under Section 16 of the Clayton Act. The NFL cross-appeals the district court's class-certification decisions. In a concurrently filed memorandum disposition, we affirm class certification under Federal Rule of Civil Procedure 23(b)(3). We also reverse judgment as a matter of law for the NFL on the Subscribers' Section 16 claims, and remand to the district court the issue of whether the injunctive classes certified under Federal Rule of Civil Procedure 23(b)(2) should be decertified now that the NFL-DirecTV Agreement has expired.

commits an abuse of discretion if it fail[s] to apply the correct legal rule or, if the correct legal rule was applied, if the court's decision 'resulted from a factual finding that was illogical, implausible, or without support in inferences that may be drawn from the facts in the record.'" *Colchester v. Lazaro*, 16 F.4th 712, 725 (9th Cir. 2021) (quoting *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc)).

## II. DISCUSSION

Section 4 of the Clayton Act provides a private right of action for parties injured by antitrust violations, including those alleged in the Subscribers' complaint: Sherman Act Section 1, a contract in restraint of trade, and Section 2, monopolization. 15 U.S.C. §§ 1–2, 15. To prove both claims, the Subscribers needed to establish several overlapping elements, including that the NFL caused them antitrust injury and damages. *See CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 150 F.4th 1056, 1066–67 (9th Cir. 2025). This appeal concerns only those two elements, which the Subscribers sought to prove at trial through the expert testimony at issue.

To establish antitrust injury, a plaintiff must show an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes [the] defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). That is, a plaintiff must show that their "loss flows from an anticompetitive aspect or effect of the defendant's behavior." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995). The Subscribers established that the interlocking agreements injured competition by reducing the availability of, and generally increasing prices for, the out-of-market NFL telecasts. But

the Subscribers also had to show that the interlocking agreements injured them specifically. This was a harder task because, as Sunday Ticket subscribers, they had access to all out-of-market NFL games. They therefore claimed that they were injured because they were overcharged for those out-of-market telecasts when they bought Sunday Ticket.

To establish antitrust damages, a plaintiff may offer evidence that the defendant's anticompetitive conduct resulted in a measurable overcharge. *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 670–72 (9th Cir. 2022) (en banc). Modeling the difference between the real world with the anticompetitive conduct and the but-for world without it is "an exceedingly difficult task." *Fishman v. Estate of Wirtz*, 807 F.2d 520, 550 (7th Cir. 1986). Plaintiffs often do so by relying on economic experts who create models that simulate what prices would have been without the challenged conduct. These models can meet a plaintiff's burden to show that the conduct caused an antitrust injury, *see, e.g.*, *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 794–95 (6th Cir. 2002), and to quantify damages, *see, e.g.*, *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1221 (9th Cir. 1997).

The district court's grant of judgment as a matter of law to the NFL followed from its exclusion of the Subscribers' expert testimony on antitrust injury and damages. We begin with the admissibility of that expert testimony. Because the district court abused its discretion in excluding the expert testimony, it erred in granting judgment as a matter of law. We then turn to the district court's conditional grant of a new trial on damages, which arises from the same expert testimony. Granting a new trial was not an abuse of discretion because the jury did not properly consider the evidence of damages.

### A. Expert Exclusion and Judgment as a Matter of Law

Federal Rule of Evidence 702 requires a court to confirm that "an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1023 (9th Cir. 2022) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)). Expert testimony is admissible if the testimony's proponent demonstrates to the district court that it is more likely than not that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.[2]

The district court excluded the Subscribers' experts under Rule 702, finding that Dr. Rascher's testimony "was not based on a reliable methodology," *see* Fed. R. Evid. 702(c), that Dr. Zona's testimony was not "modeled reliably," *see id.* 702(d), and that both witnesses' testimony

---

[2] Rule 702 was amended in 2023 to "clarify and emphasize that proffered expert testimony must meet the admissibility requirements of Rule 702 *by a preponderance of the evidence*." *Engilis*, 151 F.4th at 1049 (emphasis added) (citation modified). The parties did not argue before the district court, and do not argue here, that the 2023 amendment makes any difference to our analysis. *See id.* at 1050 (explaining that the amendment is "[c]onsistent" with "our precedent").

was based on speculative or infeasible factual assumptions, *see id.* 702(b). An expert's testimony is reliable if "the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013) (citation modified). Although a district court holds broad discretion to act as a gatekeeper for expert testimony, the jury remains the factfinder. *See Elosu*, 26 F.4th at 1024. That is because "where experts' opinions are not the junk science Rule 702 was meant to exclude, the interests of justice favor leaving difficult issues in the hands of the jury and relying on the safeguards of the adversary system to attack shaky but admissible evidence." *Engilis*, 151 F.4th at 1050 (citation modified). As a gatekeeper, a district court must screen expert testimony for admissibility, ensuring that it is based on reliable methods applied to sufficient facts to support the expert's opinion. *See Hyer v. City & Cnty. of Honolulu*, 118 F.4th 1044, 1056 (9th Cir. 2024) (detailing the district court's responsibility to screen expert testimony for reliability). But a district court must be careful not to let its view of the credibility or merits of an expert's testimony distort its evaluation of whether that testimony is sufficiently reliable to go to a jury. *See Engilis*, 151 F.4th at 1050. While "a district court may screen an expert opinion for reliability, and may reject testimony that is wholly speculative, it may not weigh the expert's conclusions or assume a factfinding role." *Elosu*, 26 F.4th at 1020. Whether an expert's "hypothesis is correct" or "corroborated by other evidence on the record . . . is for the litigants to argue, and for the jury to decide." *Id.* at 1026.

***1. Exclusion of Dr. Rascher's Testimony***

Dr. Rascher, an economist and professor at the University of San Francisco, testified about the

anticompetitive effects of the interlocking agreements, including the injury to competition and the higher prices the Subscribers paid for Sunday Ticket. He examined these effects by creating a but-for world based on a "yardstick." In a yardstick analysis, an expert compares the real world with the challenged anticompetitive conduct to a hypothetical but-for world without it. The expert builds the but-for world using data from a "comparable business not affected by the anticompetitive conduct at issue." *Image Tech. Servs.*, 125 F.3d at 1221.

Dr. Rascher's but-for world used the market for telecasts of games between the Top 25 college football teams as his yardstick. Dr. Rascher testified about college football's "many parallels to NFL football." For example, college football is second only to the NFL in popularity as a sports league. Both markets telecast football games played at a high level. The way the game is played is in all material ways identical, and the resulting televised products look much the same. Viewers watch the games for similar reasons, over similar seasons, usually on the weekends. "One's on Saturday, one's on Sunday," Dr. Rascher testified.

The college-football yardstick let Dr. Rascher estimate how the NFL's anticompetitive conduct affected the availability of out-of-market telecasts. College football once had an exclusive broadcasting deal like the NFL's, until the Supreme Court invalidated it. As Dr. Rascher testified, "prior to 1984, college football looked a little bit like the NFL in that the NCAA had all of the rights of the major colleges, and . . . they took those rights and sold them as . . . [a] single monopolist down into the market." Then, in 1984, the Supreme Court ruled that the NCAA's telecast agreements violated the Sherman Act. *See generally NCAA v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 120

(1984). Dr. Rascher was therefore able to compare the NFL to the college-football telecast market during and after its exclusive broadcasting deal to predict what a but-for world might look like.

Dr. Rascher testified that without the interlocking agreements, the NFL would have looked like college football after *NCAA v. Board of Regents*. That change brought the benefits of competition:

> [T]he individual colleges could sell their own rights, and they often sold them through their individual conferences. So you have multiple conferences . . . that are all separately competing to sell their games into the media market. And so you get all these different channels, and there's many more than just the ones listed here, that are showing college football games on Saturday. So that movement from monopoly or collusive monopoly to competition resulted in a plethora of college football games being shown on Saturdays.

Applying his yardstick to the NFL, Dr. Rascher found that the same thing would happen in the NFL's but-for world as happened in college football's real world: The NFL would begin telecasting out-of-market games in a similar way. He testified that in the but-for world, NFL "games then become available, just like [college football games] on Saturday, on over-the-air channels and on . . . these basic sports cable channels, and so customers don't pay anything extra above what they were already paying for their TV package." After all, NFL football "is the most popular programming on

television," so the games "will find their way on to these major networks and these major cable stations," just as they did for college football, the second most popular sport on television. In fact, as the Subscribers note, the NFL itself considered distributing out-of-market games at no extra charge based, in part, on its own comparisons with college football.

The district court held that Dr. Rascher's testimony was inadmissible because his but-for world was "*ipse dixit* opinion untethered to an economic analysis of what would have likely occurred." As the district court acknowledged at class certification, the yardstick method is a reliable method for comparing the real world to a hypothetical but-for world. *See* Fed. R. Evid. 702(c); *see, e.g.*, *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 993 F.3d 774, 788–89 (9th Cir. 2021), *abrogated on other grounds*, 31 F.4th 651 (2022); *LePage's Inc. v. 3M*, 324 F.3d 141, 165 (3d Cir. 2003); *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 155 (3d Cir. 2002); *Image Tech. Servs.*, 125 F.3d at 1221–23. But the district court found that Dr. Rascher's use of the yardstick method "fail[ed] to produce a coherent model," in part because there were too many differences between college football and the NFL. *See* Fed. R. Evid. 702(b). Dr. Rascher relied on the college-football yardstick to explain how the NFL teams would distribute games and share revenue. Without the yardstick, the district court found that Dr. Rascher's conclusion that NFL games would be "on over the air and on . . . the major cable channels" was unreliable. *See* Fed. R. Evid. 702(d).

These findings "exceed[ed] the district court's limited gatekeeping role." *Elosu*, 26 F.4th at 1026–27. "Whether [an] unaffected business properly compares to the relevant market presents a question of fact for the jury." *Image Tech.*

*Servs.*, 125 F.3d at 1221 (citation modified). Expert comparisons are admissible even when there are "very significant differences" between the two markets. *Alaska Rent-A-Car, Inc.*, 738 F.3d at 968–70. If a yardstick lacks any "reasonable similarity" to the business at issue, then it may be "too speculative to support a verdict." *Eleven Line, Inc. v. N. Tex. State Soccer Ass'n*, 213 F.3d 198, 207–08 (5th Cir. 2000). But if an expert presents a sufficient factual foundation for using a comparator, then it is for the jury to weigh whether the comparator is similar enough to use as a yardstick. *See* Fed. R. Evid. 702(b); *see also Alaska Rent-A-Car, Inc.*, 738 F.3d at 970; *Image Tech. Servs.*, 125 F.3d at 1221. Because Dr. Rascher testified to several reasonable similarities between the markets for college-football broadcasts and NFL broadcasts, the district court abused its discretion by deciding facts that should go to the jury. *See Elosu*, 26 F.4th at 1026–27.

Once Dr. Rascher could not lean on his yardstick, the district court excluded his conclusion that NFL teams "would have figured [] out" how to distribute games and share the resulting revenue. Because Rule 702(d) requires that an expert reliably apply their methods, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). But because it mistakenly excluded the college-football yardstick, the district court faulted Dr. Rascher for a "gap . . . of [its own] making." *Elosu*, 26 F.4th at 1025 (citation modified); *see also Alaska Rent-A-Car, Inc.*, 738 F.3d at 970. Rule 702(d) requires, as the district court put it, "more than just saying market participants would have figured it out." But Dr. Rascher's opinion that the NFL teams "are sophisticated entities" who would "certainly figure it out" is based on the

fact that they "figured it out in college sports." This is how yardsticks work: They rely on outcomes from a comparable market in the real world to predict outcomes for the relevant market in a but-for world. Because Dr. Rascher's conclusion was based on his yardstick, a reliable method, the district court abused its discretion by excluding his conclusion, a reliable application of that method.

Reasonable jurors may debate whether college and professional football telecasts are sufficiently similar or how out-of-market NFL games would have become available in the absence of the NFL's anticompetitive conduct. But those questions are for the jury to decide. Dr. Rascher's testimony was admissible under Rule 702.

***2. Exclusion of Dr. Zona's Testimony***

Dr. Zona, a practicing economist, testified to the overcharge the Subscribers paid for out-of-market telecasts. He discussed his "direct-to-consumer" model, which predicted a but-for world with direct-to-consumer competitors like a streaming app or website. He then used that but-for world to estimate the pricing impact of the NFL's out-of-market exclusivity with DirecTV. Dr. Zona estimated that if the NFL granted telecast rights to one additional competitor, the price of DirecTV Sunday Ticket would drop by 49.7%, and would decrease further with each additional competitor. Using the price drop from a single additional competitor entering the market, Dr. Zona calculated that the exclusivity the NFL granted to DirecTV cost residential class members $2.81 billion and commercial class members $670 million.

The district court abused its discretion when it excluded Dr. Zona's direct-to-consumer model by failing to apply the correct legal rule. Rather than evaluating the model's

methods, the district court erroneously weighed Dr. Zona's conclusion, and considered whether it was "corroborated by other evidence on the record." *Elosu*, 26 F.4th at 1020, 1025–26; *see Engilis*, 151 F.4th at 1050. The district court reasoned that because the Subscribers did not prove that a specific standalone competitor existed, Dr. Zona's direct-to-consumer but-for world was not "feasible." The Subscribers, however, offered sufficient evidence that a direct-to-consumer competitor could have existed in the absence of the NFL's exclusive deal with DirecTV. *See* Fed. R. Evid. 702(b); *see also Engilis*, 151 F.4th at 1050. Dr. Zona testified that a Netflix-like service could have streamed NFL games directly to consumers. And the NFL itself studied offering all out-of-market games on channels already available through Subscribers' regular DirecTV subscriptions. Dr. Zona's streaming testimony and the NFL's study provided a sufficient factual basis for him to opine on the feasibility of a direct-to-consumer model for game telecasts.

The district court also abused its discretion in excluding Dr. Zona's testimony on the ground that his direct-to-consumer model produced "irrational" consumer behavior. The district court found the model irrational because it predicted that some consumers in the but-for world paid more for a competitor's product than DirecTV charged for Sunday Ticket. But again the district court impermissibly weighed Dr. Zona's conclusions. *See* Fed. R. Evid. 702(d); *see also Elosu*, 26 F.4th at 1020; *Engilis*, 151 F.4th at 1050. Although an expert's conclusions and methods are not entirely distinct, *see Joiner*, 522 U.S. at 146, the "irrational" conclusion the district court flagged was an economic feature, not a bug, of his methods. Economic models routinely incorporate random variation to account for real-world individual preferences that are difficult to quantify—

for example, consumers sometimes choose products for reasons other than the price. *See* William Greene, *Discrete Choice Modeling*, in 2 *Palgrave Handbook of Econometrics* 473, 475–76 (Terence C. Mills & Kerry Patterson eds., 2009). That Dr. Zona's model reflected this reality shows the "level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). These sound modeling methods did not merit exclusion of the resulting testimony as unreliable. *See Elosu*, 26 F.4th at 1020, 1028; *Engilis*, 151 F.4th at 1050, 1052–55. Dr. Zona's testimony was admissible under Rule 702.

Lastly, the district court abused its discretion in failing to independently analyze Dr. Zona's "NFL Tax" model. That model relied on the Subscribers' theory that the NFL conspired with CBS and Fox to price Sunday Ticket at a premium to avoid drawing viewers away from the networks' game telecasts. Under this alternative model, Dr. Zona estimated that DirecTV's price for Sunday Ticket would have been 24.6% lower if the company were allowed to set its profit-maximizing price. Although the district court acknowledged this model early in its order, it did not analyze Dr. Zona's testimony about the model. The district court's criticisms of Dr. Zona's direct-to-consumer testimony do not apply to his "NFL Tax" model. So it was an abuse of discretion to exclude the "NFL Tax" model testimony without discussion. *See Hyer*, 118 F.4th at 1056; *Elosu*, 26 F.4th at 1025–26.

### ***3. Judgment as a Matter of Law***

The district court based its grant of judgment as a matter of law on its exclusion of Dr. Rascher's and Dr. Zona's expert testimony. Because those exclusions were an abuse of

discretion, we reverse the district court's grant of judgment as a matter of law. *See Elosu*, 26 F.4th at 1029 (reversing the district court's grant of summary judgment after reversing its grant of a defendant's motion to exclude expert testimony); *see also Engilis*, 151 F.4th at 1055 (affirming the district court's order granting summary judgment for the defendants after affirming its exclusion of expert testimony because the expert's "excluded opinion was the sole evidence upon which" the plaintiff established an element).

**B. New Trial**

Federal Rule of Civil Procedure 50(c)(1) provides that "[i]f the court grants a renewed motion for judgment as a matter of law, it must also conditionally rule on any motion for a new trial by determining whether a new trial should be granted if the judgment is later vacated or reversed." Fed. R. Civ. P. 50(c)(1). Under Rule 50(c), the district court conditionally granted the NFL's motion for a new trial on damages. *See* Fed. R. Civ. P. 59(a)(1)(A) (allowing a district court to grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court"). It held that even if the jury's liability verdict stood, the jury's damages award could not.

The jury awarded damages of exactly $4,610,331,671.74 for the residential class and $96,928,272.90 for the commercial class. As the district court noted in its order, this number is almost certainly the result of taking the number of class members in each class—24,105,049 residential subscribers and 506,788 commercial subscribers—and multiplying those numbers by $191.26. The $191.26 figure is notable because it represents the difference between the 2018 and 2019 residential list price of Sunday Ticket ($294) and Dr. Zona's disputed estimate of the average price paid

by Sunday Ticket residential subscribers over the class period ($102.74).

The district court granted the NFL's motion for a new trial because it determined that the jury's damages awards were "based on speculation or guesswork" and so were "clearly not supported by the evidence." A district court may grant a new trial only when "it is sufficiently certain that the jury award was not based on proper consideration of the evidence." *In re First All. Mortg. Co.*, 471 F.3d 977, 1001 (9th Cir. 2006). But it abuses its discretion when it "play[s] Monday morning quarterback and supplant[s] the jury's evaluation of the complex and conflicting evidence with [its] own." *L.A. Mem'l Coliseum Comm'n v. NFL*, 791 F.2d 1356, 1366 (9th Cir. 1986) (citation modified). If "the jury's verdicts find substantial support in the record and lie within the range sustainable by the proof," a district court cannot grant a new trial merely based on its own view of the evidence. *Id.*

The district court acted within its discretion when it inferred how the jury arrived at its award. *See First All. Mortg. Co.*, 471 F.3d at 1002–03 (reversing the district court's denial of remittitur or new trial where the jury split the difference between the parties' damages estimates, returning damages of "exactly half of the sum of the figures provided by each party's damages expert"). And it was within the district court's discretion to grant the NFL's motion because the jury's method of calculating damages showed the award was not based on a proper consideration of the evidence. *See id.* at 1001. The court instructed the jury that "the proper way to calculate . . . damages" is to find an overcharge: "the difference between the prices [the Subscribers] actually paid for Sunday Ticket and the prices [they] would have paid had there been" no anticompetitive

conduct. But here, the jury awarded damages based on the difference between the residential list price and the lower estimated actual price paid by a group that included the Subscribers. That difference—the money the Subscribers may have saved because DirecTV sold Sunday Ticket to them below the list price—reflected a discount, not an overcharge. And it did not account for what commercial subscribers paid at all, which on average was an order of magnitude higher than the residential prices. So the jury clearly awarded damages based on its improper consideration of the evidence rather than according to the district court's instructions. *See First All. Mortg. Co.*, 471 F.3d at 1001. This warrants a new trial on damages.

## III. CONCLUSION

We reverse the district court's exclusion of Dr. Rascher's and Dr. Zona's expert testimony and the resulting grant of judgment as a matter of law for the NFL. We affirm the district court's order granting a new trial on damages. We remand this case for the district court to reinstate the jury's liability verdict and hold a new damages trial.

**REVERSED IN PART, AFFIRMED IN PART, AND REMANDED.**